**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 31, 2010

STATE OF MICHIGAN

SUPREME COURT

LANSING SCHOOLS EDUCATION
ASSOCIATION, MEA/NEA, CATHY
STACHWICK, PENNY FILONCZUK,
ELIZABETH NAMIE, and ELLEN
WHEELER,

        Plaintiffs-Appellants,

v

LANSING BOARD OF EDUCATION and
LANSING SCHOOL DISTRICT,

        Defendants-Appellees.

No. 138401

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

The issue in this case is whether teachers have standing to sue the school board for failing to comply with its statutory duty to expel students that have allegedly physically assaulted those teachers. We hold that the standing doctrine adopted in *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), and extended in later cases, such as *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d

800 (2004), lacks a basis in the Michigan Constitution and is inconsistent with Michigan's historical approach to standing. Therefore, we overrule *Lee* and its progeny and hold that Michigan standing jurisprudence should be restored to a limited, prudential approach that is consistent with Michigan's long-standing historical approach to standing. Under the proper standing doctrine, we further hold that the Court of Appeals erred in determining that plaintiffs lacked standing. Therefore, we reverse and remand to the Court of Appeals to address the parties' remaining issues, including whether plaintiffs meet the requirements to bring an action for a declaratory judgment under MCR 2.605.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs are the Lansing School Education Association (LSEA), the Michigan and National Education Associations (MEA/NEA), and four teachers who are employed by defendants, the Lansing School District and the Lansing Board of Education. Each of the four teachers alleges that they were physically assaulted in the classroom by a student who was in grade six or higher, and each of the incidents was reported to a school administrator.[1] The students were suspended but not expelled. Plaintiff Filonczuk alleges that the assaultive student was returned to her building, but not to her classroom, and none of the other teachers allege that the student was returned to the same classroom or school.

---

[1] Cathy Stachwick alleges that a seventh grader threw a leather wristband with metal spikes towards her back, and the wristband bounced off the blackboard and struck her in the head. Penny Filonczuk and Ellen Wheeler allege that students in sixth grade or higher intentionally threw chairs at them. Elizabeth Namie alleges that a student in grade six or higher intentionally slapped her back.

Plaintiffs filed suit, alleging that defendants failed to comply with their mandatory duty under MCL 380.1311a(1) to expel students who physically assault a teacher.[2] They sought a writ of mandamus and declaratory and injunctive relief. In support of the action, three of the teachers filed affidavits stating that they believe that failing to expel students who physically assault a teacher increases the likelihood of other assaults and threatens the safety of the school environment. Plaintiff Filonczuk further stated that she felt discomfort due to the student's return to her building, and the other two teachers stated that they would have felt unsafe if the students who assaulted them had returned to their buildings.

Defendants moved for summary disposition, arguing that plaintiffs lack standing, the statute does not create a private cause of action, and plaintiffs' claims fail as a matter of law because the school district did not abuse its discretionary authority in determining that none of the students had committed an "assault." The trial court granted the motion, reasoning that the court lacked authority to supervise the school district's exercise of its discretion.

Plaintiffs appealed, and the Court of Appeals affirmed the trial court's grant of summary disposition on different grounds. 282 Mich App 165; 772 NW2d 784 (2009). The Court concluded that plaintiffs lacked standing under *Lee* and did not reach the

---

[2] MCL 380.1311a(1) provides in relevant part that "[i]f a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board," and the assault is reported to the school, then the school board "shall expel the pupil from the school district permanently . . . ."

3

case's merits. This Court granted plaintiffs' application for leave to appeal. 485 Mich 966 (2009).

## II. ANALYSIS

The issue in this case is whether the *Lee/Cleveland Cliffs* majority erred in adopting a standing doctrine that departed dramatically from Michigan's historical approach to standing. We hold that they did and that Michigan's standing doctrine should be restored to an approach that is consistent with the limited, prudential approach used historically. Under this approach, plaintiffs do not lack standing.

### A. THE HISTORICAL DEVELOPMENT OF MICHIGAN'S STANDING DOCTRINE

The purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to "ensure sincere and vigorous advocacy." *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995). Thus, the standing inquiry focuses on whether a litigant "is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable." *Allstate Ins Co v Hayes*, 442 Mich 56, 68; 499 NW2d 743 (1993) (quotation marks and citations omitted). This doctrine has deep roots in Michigan law, and, although it has been used with increasing frequency in modern jurisprudence, before *Lee* it remained a limited, prudential doctrine.

Historically, the standing doctrine grew out of cases where parties were seeking writs of mandamus to compel a public officer to perform a statutory duty. See, e.g., *People ex rel Ayres v Bd of State Auditors*, 42 Mich 422, 429-430; 4 NW 274 (1880); *People ex rel Drake v University of Mich Regents*, 4 Mich 98, 101-102 (1856). Standing

4

was a prudential limit, which is to say that the court's decision to invoke it was "one of discretion and not of law." *Ayres*, 42 Mich at 429. See, also, *Toan v McGinn*, 271 Mich 28, 33-34; 260 NW 108 (1935); *Thompson v Secretary of State*, 192 Mich 512, 522; 159 NW 65 (1916); *Drake*, 4 Mich at 103. The general rule was that a court would not hear a case where "an individual citizen, who is only interested in common with all other citizens of the state in the subject matter of [the] complaint," was suing a public entity to force compliance with a legal duty. *Drake*, 4 Mich at 101-102. Generally, the court exercised its discretion to hear a case if the citizen had "some individual interest in the subject matter of [the] complaint which is not common to all the citizens of the state . . . ." *Id.* at 103. This was sometimes articulated as a special or specific injury or interest. *Inglis v Pub Sch Employees Retirement Bd*, 374 Mich 10, 13; 131 NW2d 54 (1964); *Hastings Bd of Ed v Gilleland*, 191 Mich 276, 278; 157 NW 609 (1916); *Brophy v Schindler*, 126 Mich 341, 347; 85 NW 1114 (1901).

This rule was eventually applied in other cases where a party sought enforcement of a public right without a clear cause of action under the law, including where a plaintiff was seeking an injunction against a state agency on the basis that the agency's actions were unconstitutional. *Home Tel Co v Michigan R Comm*, 174 Mich 219, 223-226; 140 NW 496 (1913). See, also, *Gilleland*, 191 Mich at 278, listing remedies to which the rule had been extended. Notably, these cases only discussed the doctrine when no cause of action was clearly provided under law and the Court was deciding whether, within its discretion, to allow the party to bring the claim despite the lack of an express cause of action. Further, the standing inquiry was distinct from the merits of the case. Thus,

although the Court sometimes reached the merits of a case despite concluding that a party lacked standing, the Court did not find it necessary to determine whether a party's claim had merit in order to determine whether a party had standing.

References to standing became more frequent in Michigan's modern jurisprudence, and the doctrine was developed more extensively but remained a prudential limit that could, within the Court's discretion, be ignored.[3] Further, the fact that there was a cause of action under law, or the Legislature expressly conferred standing, was sufficient to establish standing.[4] Where a party was seeking declaratory relief, the Court repeatedly held that meeting the requirements of the court rule governing declaratory actions was sufficient to establish standing. *House Speaker v Governor*, 443 Mich 560, 572-573; 506 NW2d 190 (1993); *Allstate*, 442 Mich at 69-70; *Sloan v*

---

[3] See *Detroit City Council v Mayor of Detroit*, 449 Mich 670, 679 n 10; 537 NW2d 177 (1995), stating that the Court was not reaching the standing issue because the parties did not raise or brief it; *People v Kevorkian*, 447 Mich 436, 447 n 1; 527 NW2d 714 (1994) (opinion by CAVANAGH, C.J., and BRICKLEY and GRIFFIN, JJ.), noting that it was not addressing standing because the parties had not raised it; *Auto Club Ins Ass'n v Frederick & Herrud, Inc (After Remand)*, 443 Mich 358, 371-372; 505 NW2d 820 (1993), noting that federal courts had split on whether subrogees had standing to sue under a federal act but the Court would permit a subrogee to sue "as a matter of public policy"; *Blue Cross & Blue Shield v Governor*, 422 Mich 1, 103 n 6; 367 NW2d 1 (1985) (opinion by LEVIN, J.), deciding to give a decision on the merits regardless of whether the plaintiff had standing because "this litigation has been pending for a number of years and the Legislature and the people need a decision . . . ."

[4] See, generally, *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 45; 576 NW2d 641 (1998) (CAVANAGH, J., dissenting), discussing the historical importance and validity of the Michigan environmental protection act's citizen-standing provision. See, also, *Walterhouse v Ackley*, 459 Mich 924 (1998); *Frame v Nehls*, 452 Mich 171, 177-178; 550 NW2d 739 (1996).

*Madison Hts*, 425 Mich 288, 294-295; 389 NW2d 418 (1986). See, also, *East Grand Rapids Sch Dist v Kent Co Tax Allocation Bd*, 415 Mich 381, 392-395; 330 NW2d 7 (1982); *Workman v Detroit Auto Inter-Ins Exch*, 404 Mich 477, 492 n 1; 274 NW2d 373 (1979); *Shavers v Attorney General*, 402 Mich 554, 588-592; 267 NW2d 72 (1978). The Court also reaffirmed that "[s]tanding does not address the ultimate merits of the substantive claims of the parties." *Detroit Fire Fighters Ass'n*, 449 Mich at 633 (opinion by WEAVER, J.). See also *Eide v Kelsey-Hayes Co*, 431 Mich 26, 50 n 16; 427 NW2d 488 (1988) (opinion by GRIFFIN, J), treating standing as an inquiry that was distinct from whether the plaintiff's requested remedy was available.

While the doctrine continued to serve the purpose of ensuring "sincere and vigorous advocacy" by litigants, over time the test for satisfying this requirement was further developed. In cases involving public rights, the Court held that a litigant established standing by demonstrating a "substantial interest [that] will be detrimentally affected in a manner different from the citizenry at large." *House Speaker*, 443 Mich at 572 (quotation marks and citations omitted). Additionally, however, the Court recognized that even if a statute did not expressly grant standing, it could be implied from duties created by law. See *Romulus City Treasurer v Wayne Co Drain Comm'r*, 413 Mich 728, 741; 322 NW2d 152 (1982), stating that there were cases in which "standing was not expressly granted by statute [but] standing was implied by the duties and obligations that were expressly stated." Thus, where a statute did not expressly grant standing, this Court would consider whether the Legislature nonetheless intended to

7

confer standing on the plaintiffs.[5]  *Bradley v Saranac Bd of Ed*, 455 Mich 285, 296; 565 NW2d 650 (1997); *Bowie v Arder*, 441 Mich 23, 42; 490 NW2d 568 (1992); *Girard v Wagenmaker*, 437 Mich 231, 235; 470 NW2d 372 (1991); *Shavers*, 402 Mich at 587.  In a case involving private rights, the Court explained that the litigant should have "some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of the controversy."  *Bowie*, 441 Mich at 42 (quotation marks and citation omitted).

In summary, standing historically developed in Michigan as a limited, prudential doctrine that was intended to "ensure sincere and vigorous advocacy" by litigants.  If a party had a cause of action under law, then standing was not an issue.  But where a cause of action was not provided at law, the Court, in its discretion, would consider whether a litigant had standing based on a special injury or right or substantial interest that would be detrimentally affected in a manner different from the citizenry at large, or because, in the context of a statutory scheme, the Legislature had intended to confer standing on the

---

[5] Although the Court splintered on how to articulate when standing could be implied from a statutory scheme that does not expressly grant standing in the last major pre-*Lee* case addressing this issue, *Detroit Fire Fighters Ass'n*, Justice WEAVER's lead opinion articulated general principles consistent with the historical approach.  449 Mich at 633.  Further, Justice MALLETT's statement that the key issue is "whether the plaintiff can demonstrate any special right, injury, or zone of interest that deserves the protections of the law," is consistent with the historical doctrine.  449 Mich at 663 (MALLETT, J., concurring in the result only).  Justice RILEY's concurrence, however, erred in conflating the distinct inquiries of whether a plaintiff has standing under a statutory scheme and whether there is an implied statutory cause of action.  449 Mich at 644-645.

litigant. It was not necessary to address the merits of the case in order to address standing.

## B. THE *LEE/CLEVELAND CLIFFS* STANDING DOCTRINE

Despite the consistency of the historical development of the standing doctrine in Michigan, *Lee* and its progeny abruptly departed from precedent and radically changed the standing doctrine. This doctrine's flaws are many.

### 1. OVERVIEW OF THE *LEE/CLEVELAND CLIFFS* MAJORITY'S APPROACH TO STANDING

In *Lee*, a majority of the Court determined, for the first time in Michigan jurisprudence, that standing was *required* by the Michigan Constitution, and, further, that Michigan's standing doctrine should be abandoned in favor of the standing doctrine adopted by the United States Supreme Court in the context of the federal constitution. The reasoning presented in *Lee*, and expanded in *Cleveland Cliffs*, is that standing is essential to Michigan's separation of powers doctrine. See *Lee*, 464 Mich at 735. The *Lee/Cleveland Cliffs* majority explained that Article III, § 1 of the federal constitution grants federal courts only the "judicial power" and Article III, § 2 limits the judicial power to certain "Cases" or "Controversies." *Lee*, 464 Mich at 735. Although the Michigan Constitution does not include "Cases" or "Controversies" requirements, the *Lee/Cleveland Cliffs* majority concluded that the Michigan Constitution is analogous to the federal constitution because it expressly requires the separation of powers and grants courts only the judicial power. *Cleveland Cliffs*, 471 Mich at 615; *Lee*, 464 Mich at 737-738. The majority further determined that the cornerstone of the judicial power is the

9

case-or-controversy requirement. *Id.*[6] The *Lee*/*Cleveland Cliffs* majority thus concluded that Michigan should adopt the federal constitutional standing test from *Lujan v Defenders of Wildlife*, 504 US 555, 560; 112 S Ct 2130; 119 L Ed 2d 351 (1992), as the "irreducible constitutional minimum of standing . . . ."[7]

The *Lee*/*Cleveland Cliffs* majority also held that a litigant must meet the *Lujan* standing requirements regardless of whether the Legislature expressly created a cause of action or conferred standing on the litigant because, although the Legislature has the power to create causes of actions, it does not have the power to expand the judicial authority granted to the courts by the Michigan Constitution. See *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280, 302-303; 737 NW2d 447 (2007). The Court also held that a litigant must meet *Lujan*'s requirements in order to bring a declaratory action. *Associated Builders & Contractors v Dep't of*

---

[6] *Lee* cited older Michigan caselaw to define the judicial power as "the power to hear and determine controversies between adverse parties, and questions in litigation," and "the authority to hear and decide controversies, and to make binding orders and judgments respecting them." 464 Mich at 738, quoting *Daniels v People*, 6 Mich 381, 388 (1859), and *Risser v Hoyt*, 53 Mich 185, 193; 18 NW 611 (1884) (emphasis omitted). The *Cleveland Cliffs* majority, however, only cited federal caselaw in support of its contention that "[p]erhaps the most critical element of the 'judicial power' has been its requirement of a genuine case or controversy between the parties . . . ." *Cleveland Cliffs*, 471 Mich at 615.

[7] The test requires that the plaintiff show (1) an injury-in-fact, meaning the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causality, meaning that the injury is "fairly trace[able]" to the challenged conduct; and (3) redressability, meaning that it is "likely" that a favorable decision would "redress" the injury. *Lee*, 464 Mich at 739 (quotation marks and citation omitted).

*Consumer & Indus Servs Dir*, 472 Mich 117, 124-127; 693 NW2d 374 (2005).  Thus, after *Lee* and its progeny, little remained of the historical limited, prudential approach to standing, and the doctrine was significantly expanded.

## 2.  CRITICISMS OF THE *LEE*/*CLEVELAND CLIFFS* MAJORITY'S APPROACH TO STANDING

The flaws in the *Lee*/*Cleveland Cliffs* approach are many.[8]  Perhaps most egregiously, however, the *Lee*/*Cleveland Cliffs* majority dramatically distorted Michigan jurisprudence to invent out of whole cloth a constitutional basis for the standing doctrine and then, perplexingly, determined that Michigan's standing doctrine should be essentially coterminous with the federal doctrine, despite the significant differences between the two constitutions and the powers held by the respective court systems. There is no support in either the text of the Michigan Constitution or in Michigan jurisprudence, however, for recognizing standing as a constitutional requirement or for adopting the federal standing doctrine.

To begin with, there is no textual basis in the Michigan Constitution for concluding that standing is constitutionally required, and there are important differences between the two constitutions.  The Michigan Constitution provides for the separation of powers between the legislative, judicial, and executive branches and vests the courts with

---

[8] Only the fundamental legal error most relevant to the stare decisis analysis will be reviewed because other criticisms have been thoroughly addressed in various opinions in this Court.  For further discussion, however, see, e.g., *Cleveland Cliffs*, 471 Mich at 651-675, (WEAVER, J., concurring); *Mich Citizens for Water Conservation,* 479 Mich at 310-322 (WEAVER, J., dissenting).

the judicial power.  Const 1963, art 3, § 2; art 6, § 1.  The federal constitution similarly vests the judicial power in the courts.  US Const, art III, § 1.  Unlike the Michigan Constitution, however, the federal constitution enumerates the cases and controversies to which the judicial power extends, and the federal standing doctrine is largely derived from this art III case-or-controversy requirement.  See *Lujan*, 504 US at 560, stating that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Additionally, strictly interpreting the judicial power of Michigan courts to be identical to the federal court's judicial power does not reflect the broader power held by state courts.  Whereas federal courts only have the powers enumerated in the United States Constitution, the states retain powers not ceded to the federal government.  US Const, Am X.  See also *Cleveland Cliffs*, 471 Mich at 683-684 (KELLY, J., concurring).  As this Court has stated, in Michigan, "[w]hile the legislature obtains legislative power and the courts receive judicial power by grant in the State Constitution, the whole of such power reposing in the sovereignty is granted to those bodies except as it may be restricted in the same instrument."[9]  *Washington-Detroit Theatre Co v Moore*, 249 Mich 673, 680; 229 NW 618 (1930).  Given that the text of the Michigan Constitution lacks an express basis for importing the federal case-or-

---

[9] As noted in Justice WEAVER's *Cleveland Cliffs* concurring opinion, and discussed in her concurrence in this case, adopting standing as a constitutional doctrine potentially may even violate the separation of powers doctrine under the Michigan Constitution.  471 Mich at 668-669.

controversy requirement into Michigan law, the justification for doing so, if one can be found, must lie elsewhere.

The *Cleveland Cliffs* majority dismissed the lack of a textual case-or-controversy requirement in the Michigan Constitution as irrelevant because it held that the case-or-controversy requirement is a limitation inherent in the judicial power.[10] However, even assuming arguendo that the judicial power implicitly extends only to cases or controversies, there is no basis for rejecting the understanding Michigan courts traditionally had of this power to instead give it the same meaning it has in the very different context of the federal constitution. This conclusion is certainly not required by federal law, as the United States Supreme Court has "recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability . . . ." *ASARCO Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989).[11] There is also no basis for doing so in Michigan law, as this Court long

---

[10] The *Cleveland Cliffs* majority dismissed the cases or controversies requirements in art III, § 2 of the federal constitution as merely explaining the types of cases and controversies over which the Court had jurisdiction, rather than as the source of the case-or-controversy requirement itself, which it considered to be inherent in the grant of judicial power in art III, § 1. 471 Mich at 626-627.

[11] As the dissent notes, some of our sister states have chosen to adopt a standing doctrine similar to the *Lujan* test. But, of course, other state's courts' interpretations of their own constitutions are not binding or even necessarily instructive to our interpretation of the Michigan Constitution. Furthermore, many states have either declined to adopt the *Lujan* standing test or do not apply it exclusively. See, e.g., *Kellas v Dep't of Corrections*, 341 Or 471, 478; 145 P3d 139 (2006), noting that "[t]he Oregon Constitution contains no 'cases' or 'controversies' provision" and declining to "import

ago explained that Michigan courts' judicial power to decide controversies was broader than the United States Supreme Court's interpretation of the art III case-or-controversy limits on the federal judicial power because a state sovereign possesses inherent powers that the federal government does not. *Washington-Detroit Theatre Co*, 249 Mich at 679-680.[12]

federal law regarding justiciability into our analysis of the Oregon Constitution and rely on it to fabricate constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government." See also *Coalition for Adequacy & Fairness in School Funding, Inc v Chiles*, 680 So 2d 400, 403 (Fla, 1996), holding that a citizen taxpayer has standing to challenge the legislature's exercise of its taxing and spending power without demonstrating a special injury and stating that "in Florida, unlike the federal system, the doctrine of standing has not been rigidly followed"; *Lebron v Gottlieb Mem Hosp*, 2010 Ill LEXIS 26, *52 (Ill, 2010), explaining that "[t]his court is not required to follow federal law on issues of standing, and has expressly rejected federal principles of standing"; *Nefedro v Montgomery Co* 2010 Md LEXIS 210, *8 n 3 (Md, 2010), explaining that the *Lujan* standing doctrine did not apply because it "is not applicable to state courts"; *Tax Equity Alliance for Massachusetts v Comm'r of Revenue*, 423 Mass 708, 714; 672 NE2d 504, (1996), explaining that under Massachusetts's "public right doctrine," a citizen has standing to "seek relief in the nature of mandamus to compel the performance of a duty required by law"; *Jen Electric, Inc v Co of Essex,* 197 NJ 627, 645; 964 A2d 790 (2009*)*, explaining that, in New Jersey, "[s]tanding is a creature of the common law" and a "liberal rule[]" because "overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of just and expeditious determinations on the ultimate merits." (Quotation marks and citations omitted.)

[12] The dissent offers quotations from delegates to the Michigan Constitutional Convention to support its position that the judicial power extends only to cases or controversies. Even setting aside whether there is a truly logical distinction between the dissent's criticisms of the use of legislative history to interpret a statute and its use of a delegate's preenactment impressions of constitutional text to interpret that text, these quotations provide no support that any delegate believed that standing was a constitutional requirement. They merely demonstrate that certain delegates believed that the judicial power extended to cases and controversies, which, at that time, had never been interpreted to incorporate standing as a constitutional requirement in Michigan.

Most importantly, however, not only does the federal standing jurisprudence have no basis in Michigan law, it is contrary to it. As explained above, before *Lee*, the standing doctrine was not treated as a constitutional requirement in Michigan jurisprudence; that is, the Court never concluded that a lack of standing equated to the lack of a controversy necessary for the invocation of the judicial power under the Michigan Constitution. As discussed, before *Lee*, from the doctrine's inception this Court has at times addressed a case's merits despite concluding that the parties lacked standing. And, more generally, before *Lee*, "controversy" was never interpreted, as it is under *Lujan,* to refer only to instances where the party suffered a concrete and particularized injury caused directly by the challenged conduct. Thus, the Michigan Constitution does not compel adoption of the federal standing doctrine, and there is no support for doing so in this Court's historical jurisprudence.

Indeed, the *Lee*/*Cleveland Cliffs* majority, and the dissent in this case, make unsupported logical, or, rather, illogical, leaps. They expend significant energy explaining that Michigan law has historically required a case or a controversy to invoke the judicial power. See, e.g., *Cleveland Cliffs*, 471 Mich at 626-628. Then, citing only cases that stand for that limited proposition, and without distinguishing or overruling the volume of precedent discussed in this opinion, they conclude that simply because this Court has stated that the judicial power extends to cases and controversies, standing is therefore required by the Michigan Constitution and must be equivalent to the federal standing doctrine adopted in *Lujan*. *Id.* at 628-629. They utterly fail to explain, however, why decades of Michigan standing jurisprudence must be sacrificed on the altar

15

of the United States Supreme Court's interpretation of the *federal* case-or-controversy requirement, despite the lack of support in Michigan caselaw for understanding a "controversy" to exist only in the same, limited circumstances explained in *Lujan* and despite the conflict with *Michigan's* historic approach to standing.

## C. STARE DECISIS

In light of the fact that the Michigan Constitution's reference to the judicial power does not inherently incorporate the federal case-or-controversy requirement, and, in fact, importing this requirement is inconsistent with this Court's historical view of its own powers and the scope of the standing doctrine, the question arises as to whether this Court should continue to apply the *Lee*/*Cleveland Cliffs* doctrine. Under the long-standing doctrine of stare decisis, "principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed." *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996) (quotation marks and citations omitted). The importance of the stare decisis doctrine is well-established, for, as Alexander Hamilton stated, to "'avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them . . . .'" *Petersen v Magna Corp*, 484 Mich 300, 314-315; 773 NW2d 564 (2009) (opinion by KELLY, C.J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961). As the United States Supreme Court has stated, the doctrine "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity

16

of the judicial process." *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991).

Despite its importance, stare decisis is neither an "inexorable command," *Lawrence v Texas*, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor "a mechanical formula of adherence to the latest decision . . . ." *Helvering v Hallock*, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940). Ultimately, it "attempts to balance two competing considerations: the need of the community for stability in legal rules and decisions and the need of courts to correct past errors." *Petersen*, 484 Mich at 314 (opinion by KELLY, C.J.). To reflect this balance, while there is a presumption in favor of upholding precedent, this presumption may be rebutted if there is a special or compelling justification to overturn precedent. *Id.* at 319-320. In determining whether a special or compelling justification exists, a number of evaluative criteria may be relevant, *id.*,[13] but overturning precedent requires more than a mere belief that a case was wrongly decided. See *Brown*, 452 Mich at 365.[14]

---

[13] In *Petersen*, Chief Justice KELLY provided a nonexhaustive list of criteria that may be considered, but none of the criteria are determinative, and they need only be evaluated if relevant. See *Petersen*, 484 Mich at 320.

[14] In addition to firing its standard shot impugning my commitment to the doctrine of stare decisis, today the dissent also claims that the justices of this Court must adopt a uniform approach to stare decisis and criticizes me for applying a "minority" approach rather than *Robinson v Detroit*, 462 Mich 439, 464-466; 613 NW2d 307 (2000). As discussed in concurrences by Justice WEAVER and Justice HATHAWAY, however, justices may take varying approaches to stare decisis. Indeed, the United States Supreme Court has not applied one strict standard or a single "commonly accepted test," *post* at __, when considering stare decisis issues and has applied various approaches, even within the same year. For example, in *Montejo v Louisiana*, ___ US ___, ___; 129 S Ct 2079, 2088-2089;

In this case, the question is whether there is a special or compelling justification to overrule the *Lee*/*Cleveland Cliffs* majority's decision to dramatically depart from this Court's deeply rooted standing doctrine. We hold that there is.

To begin with, a case may be given less deference when it was an abrupt departure from long-standing precedent and lacks a constitutional basis. *Adarand Constructors, Inc v Pena*, 515 US 200, 231-234; 115 S Ct 2097; 132 L Ed 2d 158 (1995). In such cases, "[b]y refusing to follow [the erroneous precedent], then, we do not depart from the fabric of the law; we restore it." *Id.* at 233-234. As discussed, *Lee* and its progeny departed dramatically from historical jurisprudence in Michigan, and the bounds of the constitutional text, when they interpreted the *Michigan* Constitution to compel a standing

---

173 L Ed 2d 955, 967 (2009), in an opinion authored by Justice Scalia, the Court explained that "the fact that a decision has proved 'unworkable' is a traditional ground for overruling it." The Court also stated that other relevant factors include "the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned." Yet, in *Pearson v Callahan*, ___ US ___, ___; 129 S Ct 808, 816; 172 L Ed 2d 565, 574 (2009), in an unanimous opinion authored by Justice Alito, the Court stated that "[r]evisiting precedent is particularly appropriate where . . . a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings."

Ironically, the very doctrine and approach that the dissent claims to vehemently adhere to today was not so faithfully applied by the members of the dissent in the past. Indeed, the members of the dissent have overruled caselaw without even paying lip service to *Robinson*, see, e.g., *People v Anstey*, 476 Mich 436; 719 NW2d 579 (2006), or after engaging in a cursory, or limited, analysis of the factors that they claim fidelity to today. See, e.g., *Wesche v Mecosta Co Rd Comm*, 480 Mich 75, 91 n 13; 746 NW2d 847 (2008); *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280, 297 n 10; 731 NW2d 29 (2007); *Neal v Wilkes*, 470 Mich 661, 667 n 8; 685 NW2d 648 (2004); *People v Hickman*, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004); *Mack v Detroit*, 467 Mich 186, 203 n 19; 649 NW2d 47 (2002).

doctrine that is essentially coterminous with the federal standing doctrine. Thus, by reinstating the decades-old precedent from which *Lee* departed, we are restoring, not departing from, the fabric of the law and this Court's fidelity to the Michigan Constitution.[15]

Further, regardless of the level of deference due *Lee* and *Cleveland Cliffs*, there is a compelling justification to overrule the standing doctrine adopted in those cases. I find several evaluative criteria to be relevant, including: (1) "whether the rule has proven to be intolerable because it defies practical workability"; (2) "whether reliance on the rule is such that overruling it would cause a special hardship and inequity"; (3) "whether upholding the rule is likely to result in serious detriment prejudicial to public interests"; and (4) "whether the prior decision was an abrupt and largely unexplained departure from precedent." *Petersen*, 484 Mich at 320.[16]

---

[15] Contrary to the mewling of the dissenters, who would enshrine their disembowelment of 10 to 50 years of this Court's jurisprudence, in *Lee* and many other cases, this majority's reversal of their recent activist efforts simply brings this Court back to the *status quo ante*. Indeed, the dissenters' stare decisis protestations should taste like ashes in their mouths. Although the dissenters paid absolutely no heed to stare decisis as they denigrated the wisdom of innumerable predecessors, the dissenters would now wrap themselves in its benefits to save their recent precedent.

[16] The other criteria suggested by Chief Justice KELLY in *Petersen* are not applicable to this case or are neutral. For example, perhaps because the case was recently decided, there are no related principles of law that have eroded the rule and there are no significant changed facts or circumstances. Further, as noted, the jurisprudence from other states and jurisdictions has limited value because it is based on distinct jurisprudential history and constitutions, and, regardless, there are states that have followed *Lujan* and there are states that have rejected it.

The first criterion weighs slightly in favor of affirming the *Lee*/*Cleveland Cliffs* standing doctrine because, although confusion sometimes arises over the application of the factors, the test does not rise to the level of defying practical workability.

The second criterion, the strength of reliance on the rule, weighs in favor of overruling *Lee* and *Cleveland Cliffs* because it seems unlikely that potential future defendants, including the government, have been violating laws on the basis of the assumption it could not be challenged because no party would have standing under *Lee* to do so. To the extent that such interests exist, they are not the type of reliance interests that this Court seeks to protect.

The third criterion weighs heavily in favor of overruling *Lee* because the doctrine is likely to result in serious detriment to the public interest. The purpose of the standing doctrine in Michigan has always been to "ensure sincere and vigorous advocacy." But the *Lee*/*Cleveland Cliffs* standing doctrine is, at the expense of the public interest, broader than this purpose because it may prevent litigants from enforcing public rights, despite the presence of adverse interests and parties, and regardless of whether the Legislature intended a private right of enforcement to be part of the statute's enforcement scheme. As noted by Chief Justice KELLY's *Cleveland Cliffs* concurrence, the *Lee*/*Cleveland Cliffs* standing doctrine "creates a self-inflicted wound" that prevents the Court from serving justice and protecting the public interest. 471 Mich at 689. Further, as many commentators have noted, the federal standing doctrine has the effect of encouraging courts to decide the merits of a case under the guise of merely deciding that the plaintiff lacks standing, thus using "standing to slam the courthouse door against

20

plaintiffs who are entitled to full consideration of their claims on the merits." *Valley Forge Christian College v Americans United for Separation of Church & State*, 454 US 464, 490; 102 S Ct 752; 70 L Ed 2d 700 (1982) (Brennan, J., dissenting) (quotation marks and citation omitted).[17] Thus, the *Lee*/*Cleveland Cliffs* standing doctrine is overly broad compared to the doctrine's historical purpose and development and unjustifiably "slams the courthouse door" on numerous controversies that present legitimately adverse parties and interests.

Finally, the fourth criterion weighs heavily in favor of overruling precedent because, as discussed above, by adopting the *Lujan* test as a constitutionally required standing doctrine, the majority casually displaced decades of inconsistent precedent without notice or adequate explanation and thus implemented an abrupt and insufficiently explained departure from precedent.

In light of these considerations, we hold that *Lee* and its progeny should be overruled.[18]

---

[17] See, e.g., *Allen v Wright*, 468 US 737, 782; 104 S Ct 3315; 82 L Ed 2d 556 (1984) (Brennan, J., dissenting), quoting numerous academic commentaries to explain that "[m]ore than one commentator has noted that the causation component of the Court's standing inquiry is no more than a poor disguise for the Court's view of the merits of the underlying claims." Indeed, there is perhaps no better example of this then the dissenting opinion in this case, which, in order to apply the *Lee* standing test, also voluminously addressed the merits of each of plaintiffs' claims and the availability of the remedies they sought.

[18] The cases extending or applying *Lee* and *Cleveland Cliffs* include: *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007); *Mich Citizens for Water Conservation*; *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Servs*, 475 Mich 363; 716 NW2d 561 (2006). Further, *Associated Builders & Contractors*, 472

D. THE PROPER STANDING DOCTRINE

1. OVERVIEW OF THE PROPER APPROACH TO STANDING

The question then becomes what standing doctrine this Court should adopt in lieu of *Lee*/*Cleveland Cliffs*. We hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine that is consistent with Michigan's long-standing historical approach to standing.[19] Under this approach, a litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment.[20] Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

---

Mich at 126-127, is overruled to the extent that it required a litigant to establish the *Lee*/*Cleveland Cliffs* standing requirements in order to bring an action under MCR 2.605.

[19] The dissent's Chicken Little-esque wails of the impending stampede to the courthouse that will result from today's decision ignore that we do nothing more than restore an approach to standing that is consistent with the approach that this Court followed for decades without courts being overburdened with a flood of litigation before *Lee* was decided a mere *nine* years ago.

[20] The pre-*Lee*/*Cleveland Cliffs* standard, which was also incorporated into *Associated Builders & Contractors*, remains: "[t]he essential requirement of the term 'actual controversy' under the rule is that plaintiffs 'plead and prove facts which indicate an adverse interest necessitating the sharpening of the issues raised.'" *Associated Builders & Contractors*, 472 Mich at 126, quoting *Shavers*, 402 Mich at 589.

22

## 2. APPLICATION OF THE STANDING DOCTRINE TO THIS CASE

The next question is whether, in this case, plaintiffs have standing. Plaintiffs seek a declaratory judgment, a writ of mandamus, and injunctive relief.[21] We hold that plaintiffs have standing to pursue at least some of their claims.

To begin with, under the proper approach to standing, plaintiffs may seek a declaratory judgment if the requirements in MCR 2.605 are met. We remand to the Court of Appeals to decide whether plaintiffs meet the requirements of MCR 2.605 because it did not previously address this issue.

Further, we must decide whether plaintiffs have standing to pursue the rest of their claims because the Revised School Code, MCL 380.1 *et seq*., does not create an express cause of action or expressly confer standing on plaintiffs to enforce the act's provisions.[22] We hold that, in this case, plaintiffs have standing because they have a substantial

---

[21] It is not disputed that, under Michigan law, an organization has standing to advocate for the interests of its members if the members themselves have a sufficient interest. See, e.g., *Trout Unlimited, Muskegon-White River Chapter v White Cloud*, 195 Mich App 343, 348; 489 NW2d 188 (1992). Thus, because we hold that the plaintiff-teachers have standing, and it is not disputed that the plaintiff-teachers are members of the plaintiff-organizations, the plaintiff-organizations have standing as well.

[22] In dicta, the Court of Appeals decision in this case suggested that there is no implied private cause of action to enforce the Revised School Code. We do not reach the merits of that issue, however, because plaintiffs are not seeking a private cause of action for damages. See, generally, *Lash v Traverse City*, 479 Mich 180, 196-197; 735 NW2d 628 (2007), explaining that a party may seek remedies other than monetary damages, such as declaratory relief under MCR 2.605(A)(1), against a governmental unit without having to demonstrate that a statute has an implied private right of action.

interest in the enforcement of MCL 380.1311a(1) that will be detrimentally affected in a manner different from the citizenry at large if the statute is not enforced.

To begin with, the text of MCL 380.1311a itself suggests that plaintiffs have a substantial and distinct interest. It requires that a qualifying student be expelled for physically assaulting an employee of the school, which is defined to include the plaintiff-teachers. Given that the students are expelled for assaulting employees of the school, and not the citizenry at large, it is apparent from the statute that the plaintiff-teachers have a substantial interest in the enforcement of this provision distinct from the general public. The members of the general public might never be in a school, and, even for those who are, an assault on those members would not necessarily lead to the expulsion of the assaultive student.

Moreover, the legislative history to the 1999 legislative amendments that adopted MCL 380.1311a(1) into the Revised School Code make clear that the purpose of the section is to create a safer school environment and, even more specifically, a safer and more effective working environment for teachers.[23] The enrolled analysis of the public

_____

[23] The dissent suggests that the same limitations that apply to using legislative history to *interpret* a statute should be applied to determining whether a party has a substantial and distinct interest in the statute's enforcement that is sufficient to establish standing. We disagree. If the Legislature unambiguously expresses an intent to confer standing through a statute's text, then it would certainly be sufficient to confer standing. But the inquiry into whether a party has a substantial and distinct interest in the enforcement of the statute is a much broader inquiry for which legislative history may be instructive. Indeed, before *Lee*, this Court would sometimes consider legislative history in determining whether a party had standing. See, e.g., *Frame v Nehls*, 452 Mich 171, 176-180; 550 NW2d 739 (1996); *Girard*, 437 Mich at 244-247. Further, while analyzing legislative intent is essential if a party is attempting to demonstrate that the Legislature

24

act adopting the amendments explained that the rationale for their enactment is that "[i]n Michigan, school safety is an ongoing concern," and, although an earlier public act "addresses several aspects of school violence, additional concerns remain," and "[i]n particular, it has been suggested that students should be expelled or suspended when they physically or verbally assault teachers or other school personnel . . . ."  Enrolled Senate Fiscal Agency Analysis of SB 183, SB 206, HB 4240, and HB 4241, July 21, 1999.  The analysis explains that the arguments in favor of the act included that "additional measures are necessary to create and maintain a safe educational environment" because "*[t]eachers who are subject to student assaults cannot effectively teach*, and pupils who feel endangered cannot learn."  (Emphasis added.)  It further explained that "[s]ince just one miscreant can disrupt an entire classroom, and a handful can ruin the atmosphere of a school, removing these individuals will promote efforts to educate and to learn, as well as *protect the physical safety of school personnel* and students" and concluded by explaining that "[a] comprehensive State approach toward student violence should deter future assaults and other disciplinary problems."  (Emphasis added.)  In other words, the legislative history of the act indicates that the intended purposes of MCL 380.1311a(1) are exactly what common sense would suggest based on the statutory text: to make the school and classroom environment safer in general and specifically to protect teachers'

intended to confer standing or create a private right that the party would have standing to enforce, this Court has not historically found an analysis of legislative intent necessary for a party to demonstrate that the party has a substantial interest in the enforcement of a statute relating to a public right that is distinct from that of the general public.  See, e.g., *House Speaker v State Admin Bd*, 441 Mich 547; 495 NW2d 539 (1993).

physical safety and their ability to effectively teach by removing miscreants and assisting in deterring future assaults. The plaintiffs-teachers' affidavits indicate that, consistent with these purposes, the alleged failure of the school board to comply with the statute increases the threat to their safety.

In light of these purposes, and the plaintiffs-teachers' affidavits, it is even more clear that teachers have a substantial interest in the enforcement of MCL 380.1311a(1) that is distinct from that of the general public. The legislative history specifically contemplates that the statute is intended to not only make the general school environment safer but additionally to specifically protect *teachers* from assault and to assist them in more effectively performing their jobs. These are hardly interests that are shared by the general public. [24] Thus, teachers who work in a public school have a significant interest distinct from that of the general public in the enforcement of MCL 380.1311a(1).

_____

[24] Indeed, because of this, plaintiffs' claim to having a more substantial interest than that of the general public is greater than that of the firefighter-plaintiffs in *Detroit Fire Fighters Ass'n*. In that case, Justice WEAVER's lead opinion explained, that, in her view, firefighters did not have a substantial interest in the effects of reduced funding for the fire department that was sufficiently distinct from that of the general public because, although firefighters were subject to a greater risk of harm if the number of total firefighters was reduced, members of the public who were trapped in burning houses were also subject to a greater likelihood of injury, and, thus, "[b]oth segments of society are at greater risk when there is a dearth of fire fighters." 449 Mich at 638 (quotation marks and citation omitted). Other justices, including myself, would have concluded that the firefighters did have a sufficiently distinct interest to establish standing. But, regardless, it is apparent that plaintiffs' interest in this case is even more distinct than that of the firefighters. As noted by the dissent, a teacher is more likely to be at a school, just as a firefighter is more likely to be at a fire. But whereas all members of the public are at risk of being in a building that may catch fire, all members of the public are not necessarily in schools so that they are at risk of being assaulted in a classroom or, even if they are in a school, of being affected by a less effective teaching environment.

26

We agree that, as stated by the dissent, the issue in this case is whether "a teacher [can] sue a school board for its failure to expel a student who allegedly assaulted that teacher." *Post* at ___. In its many erroneous blanket statements about what we are holding today, the dissent seems to assume that we have answered that question with a definitive "yes." To the contrary, however, we have not. We have only held that if a teacher cannot sue the school board for allegedly failing to comply with MCL 380.1311a(1), *standing* is not the reason why. In their motion for summary disposition, defendants raised several arguments as to why plaintiffs cannot sue the school board besides standing, including that plaintiffs have failed to plead a cause of action and that their claims fail as a matter of law.[25] Plaintiffs appealed those issues. Because the Court of Appeals decided the case on the basis of standing alone, and did not reach the other issues, we remand to that Court to address the remaining issues.[26]

---

[25] As discussed, the merits of a party's claims and their right to the requested remedies were frequently intertwined in the standing analysis erroneously adopted in *Lee*. Indeed, the dissent in this case perfectly models this troubling aspect of that decision. But, under the proper approach to standing, the issues of whether plaintiffs have sufficiently pleaded a cause of action and are entitled to the requested remedies are independent of the standing inquiry. Indeed, the issues the dissent raises regarding whether students' rights would be violated if a court decided to review the school board's disciplinary hearings and discretionary decision *and* found that plaintiffs were entitled to an injunction expelling the students, are certainly premature at this point.

[26] Just as the dissent's cries that the historical standing test, in general, will lead to a stampede to the courthouse ignore that we are reversing a decision that is only *nine* years old, the dissent's cries regarding the stampede of lawsuits that will result from this specific case ignore that the Revised School Code predated *Lee* and yet the courts were not overburdened with similar cases before *Lee*. The reason for this lack of lawsuits is self-evident, as standing is certainly not the only hurdle to prevailing in a case, including winning on the merits. As noted, we are not holding that there is an implied cause of

27

In summary, we hold that plaintiffs have standing because plaintiffs have a substantial interest in the enforcement of MCL 380.1311a(1) that is detrimentally affected in a manner distinct from that of the general public if the statute is not enforced.

## III.  CONCLUSION

We overrule the standing test adopted in *Lee* and its progeny and restore Michigan standing jurisprudence to be consistent with the doctrine's long-standing, prudential roots.  We reverse the Court of Appeals judgment and remand to that Court to determine whether plaintiffs meet the requirements of MCR 2.605.  Further, because we hold that plaintiffs have standing to pursue their remaining claims, we also remand to the Court of Appeals for consideration of the issues that it did not previously reach.

KELLY, C.J., and WEAVER (except for the part entitled "Stare Decisis"), and HATHAWAY, JJ., concurred with CAVANAGH, J.

---

action for private damages under the Revised School Code.  Thus, the teacher-plaintiffs seeking enforcement of MCL 380.1311a(1) must meet the requirements for some other cause of action, such as a writ of mandamus under MCR 3.305 or a declaratory action under MCR 2.605(A)(1).  As the dissent's analysis indicates, these may be difficult hurdles to clear.

28

# STATE OF MICHIGAN

## SUPREME COURT

LANSING SCHOOLS EDUCATION
ASSOCIATION, MEA/NEA, CATHY
STACHWICK, PENNY FILONCZUK,
ELIZABETH NAMIE, and ELLEN
WHEELER,

        Plaintiffs-Appellants,

v                            No. 138401

LANSING BOARD OF EDUCATION and
LANSING SCHOOL DISTRICT,

        Defendants-Appellees.

_____

WEAVER, J. (*concurring*).

I concur in and sign all of the majority opinion except part II (C), entitled "Stare Decisis."

I write separately to expand on footnote 8 of the majority opinion by providing some of the additional criticisms of *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), and its progeny mentioned in footnote 8.

As I stated in my dissenting opinion in *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280, 311; 737 NW2d 447 (2007):

> Beginning with *Lee v Macomb Co Bd of Comm'rs*, the majority overruled Michigan precedent establishing prudential standing as the traditional doctrine of legal standing in Michigan. In place of Michigan's doctrine of prudential standing, the majority erroneously adopted a

constitutional doctrine of standing based on the federal courts' doctrine of standing, as stated in *Lujan v Defenders of Wildlife*.[1]

I further stated that:

> Before *Lee*, no Michigan case had held that the issue of standing posed a constitutional issue.[2] Nor did any case hold that Michigan's judicial branch was subject to the same case-or-controversy limitation imposed on the federal judicial branch under article III of the United States Constitution.[3] In fact, article III standing derived from *Lujan* was not even an issue raised or briefed by the parties in *Lee*. On its own initiative, the majority of four raised *Lujan*'s standing test and erroneously transformed standing in Michigan into a constitutional question. [*Id*. at 312-313.]

After the majority in *Lee* created a constitutional standing test for Michigan, the

same "majority of four" (former Justice TAYLOR and Justices CORRIGAN, YOUNG, and

---

[1] *Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).

[2] Before *Lee*, the Michigan standing requirements were based on prudential, rather than constitutional, concerns. See, generally, *House Speaker v State Admin Bd*, 441 Mich 547, 559 n 20; 495 NW2d 539 (1993), and Justice RILEY's concurrence in *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 643; 537 NW2d 436 (1995).

[3] As I wrote in my concurrence in *Lee*:

> In *House Speaker* we stated that "this Court is not bound to follow federal cases regarding standing," pointing out that "[o]ne notable distinction between federal and state standing analysis is the power of this Court to issue advisory opinions. Const 1963, art 3, § 8. Under Article III of the federal constitution, federal courts may issue opinions only where there is an actual case or controversy." [*House Speaker*, 441 Mich at] 559, including n 20. Justice Kennedy, writing for the Court in *ASARCO Inc v Kadish*, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989), acknowledged:
>
> > "We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability . . . ." [*Lee*, 464 Mich at 743 n 2.]

2

MARKMAN) "next questioned the Legislature's ability to confer standing on citizens through the use of statutes granting standing when a citizen alleges a specific wrong." *Id*. at 314-315. As I further stated in *Nestlé*:

> In *Nat'l Wildlife* [*Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004)], the majority of four attacked [the Michigan Environmental Protection Act, MCL 324.1701 *et seq*. (MEPA)] by stating at length, all in dicta, that the Legislature cannot grant citizens standing. The majority based this argument on the premise that the Legislature would be taking away the power to enforce laws, an essential component of the "executive power," and giving that power to the judicial branch. The majority proudly proclaimed that it was "*resisting* an expansion of power— not an everyday occurrence in the annals of modern government."[4] Unfortunately, that statement was not accurate, because the majority showed its lack of judicial restraint by compromising the Legislature's constitutional duty to enact laws for the protection of the environment and enlarging the Court's capacity to overrule statutes under the guise of the majority's self-initiated, erroneous "constitutional" doctrine of standing.[5] [479 Mich at 315.]

As Justice CAVANAGH's majority opinion in this case states at footnote 10, I described in *Nat'l Wildlife* how the *Lee* standing doctrine violated separation of powers under the Michigan Constitution. In *Nat'l Wildlife*, I stated:

> While pretending to limit its "judicial power," the majority's application of *Lee*'s judicial standing test in this case actually expands the power of the judiciary at the expense of the Legislature by undermining the Legislature's constitutional authority to enact laws . . . . [471 Mich at 654 (WEAVER, J., concurring).]

---

[4] *Nat'l Wildlife*, 471 Mich at 639 (emphasis in original).

[5] "[F]aux judicial restraint is judicial obfuscation." *Federal Election Comm v Wisconsin Right to Life, Inc*, 551 US 449, 499 n 7; 127 S Ct 2652; 168 L Ed 2d 329 (2007) (Scalia, J., concurring in part and concurring in the judgment).

3

In expanding the judicial power by making standing a constitutional concern, the "majority of four" took

> the area of legal standing out of the hands of the Legislature and the people and placed it exclusively at [the majority of four's] mercy. To make standing a constitutional concern when our Michigan Constitution is completely silent regarding which of the government's branches has power to grant standing represents judicial activism of the most objectionable sort." [*Rohde v Ann Arbor Pub Sch*, 479 Mich 336, 373; 737 NW2d 158 (2007).]

*Lee* and its progeny clearly defied common sense and fairness, as those cases ignored Michigan's Constitution and imposed "unprecedented, judge-made restrictions on . . . access to the courts." *Nat'l Wildlife*, 471 Mich at 654 (WEAVER, J., concurring). The *Lee* standing doctrine represented an unprecedented and unrestrained expansion of judicial power that dishonored our Michigan Constitution and decimated the rule of law and therefore it must be reversed. Accordingly, for the reasons I have given over the last nine (9) years since *Lee* was decided and for the reasons in Justice CAVANAGH's majority opinion in this case, I vote to overrule *Lee* and its progeny.

With regard to the policy of stare decisis, my view is that past precedent should generally be followed but that to serve the rule of law, in deciding whether wrongly decided precedent should be overruled, each case should be looked at individually on its facts and merits through the lens of judicial restraint, common sense, and fairness. I agree with the sentiment recently expressed by Chief Justice Roberts of the United States Supreme Court in his concurrence to the decision in *Citizens United v Fed Election Comm*, 558 US ___, ___; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010), when he said that

4

*stare decisis* is neither an "inexorable command," *Lawrence* v. *Texas*, 539 U. S. 558, 577 [123 S Ct 2472; 156 L Ed 2d 508] (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering* v. *Hallock*, 309 U. S. 106, 119 [60 S Ct 444; 84 L Ed 604] (1940) . . . . If it were, segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants. See *Plessy* v. *Ferguson*, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by *Brown* v. *Board of Education*, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); *Adkins v. Children's Hospital of D. C.*, 261 U. S. 525 [43 S. Ct. 394; 67 L Ed 785] (1923), overruled by *West Coast Hotel Co* v. *Parrish*, 300 U. S. 379 [57 S. Ct. 578; 81 L Ed 703] (1937); *Olmstead* v. *United States*, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by *Katz* v. *United States*, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967).

Chief Justice Roberts further called stare decisis a "principle of policy" and said that it "is not an end in itself." *Id.* at ___; 130 S Ct at 920; 175 L Ed 2d at 807. He explained that "[i]ts greatest purpose is to serve a constitutional ideal—the rule of law. It follows that in the unusual circumstance when fidelity to any particular precedent does more to damage this constitutional ideal than to advance it, we must be more willing to depart from that precedent." *Id.* at ___; 130 S Ct at 921; 175 L Ed 2d at 807.[6]

---

[6] It appears that the dissent in this case does not agree with Chief Justice Roberts. The dissent refers to cases that have been overruled by this Court in the past 18 months. While the dissenting justices may feel aggrieved by this Court overruling those cases, amongst those cases were some of the most egregious examples of judicial activism that did great harm to the people of Michigan. Those decisions were made by the "majority of four," including the dissenting justices, under the guise of ideologies such as "textualism" and "judicial traditionalism." One of the dissenting justices, Justice YOUNG, expressed his apparent contempt for the common law and common sense in his 2004 article in the Texas Review of Law and Politics, where Justice YOUNG stated:

> Consequently, I want to focus my remarks here on the embarrassment that the common law presents—or ought to present—to a conscientious judicial traditionalist. . . .

I agree with Chief Justice Roberts that stare decisis is a policy and not an immutable doctrine. I chose not to sign Chief Justice KELLY's lead opinion in *Petersen v Magna Corp*, 484 Mich 300, 316-320; 773 NW2d 564 (2009), because it proposed to create a standardized test for stare decisis. Likewise, I do not sign the majority opinion's stare decisis section in this case because it applies *Petersen*. There is no need for this Court to adopt any standardized test regarding stare decisis. In fact, it is an impossible task. There are many factors to consider when deciding whether or not to overrule precedent, and the importance of such factors often changes on a case-by-case basis.[7]

In the end, the consideration of stare decisis and whether to overrule wrongly decided precedent always includes service to the rule of law through an application and exercise of judicial restraint, common sense, and a sense of fairness—justice for all.

---

> To give a graphic illustration of my feelings on the subject, I tend to think of the common law as a drunken, toothless ancient relative, sprawled prominently and in a state of nature on a settee in the middle of one's genteel garden party. Grandpa's presence is undoubtedly a cause of mortification to the host. But since only the most ill-bred of guests would be coarse enough to comment on Grandpa's presence and condition, all concerned simply try ignore him. [Young, *A judicial traditionalist confronts the common law*, 8 Texas Rev L & Pol 299, 301-302 (2004).]

[7] Over the past decade, the principal tool used by this Court to decide when a precedent should be overruled is the set of guidelines that was laid out in *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000), an opinion written by former Justice TAYLOR, signed by Justices CORRIGAN, YOUNG, MARKMAN and myself, and that I have used numerous times. By no means do I consider the *Robinson* guidelines a "be-all, end-all test" that constitutes precedent of this Court to be used whenever this Court considers overruling precedent. I view *Robinson* as merely providing guidelines to assist this Court in its legal analysis when pertinent.

In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion's holding that *Lee* and its progeny are overruled.

Elizabeth A. Weaver

STATE OF MICHIGAN

SUPREME COURT

LANSING SCHOOLS EDUCATION
ASSOCIATION, MEA/NEA, CATHY
STACHWICK, PENNY FILONCZUK,
ELIZABETH NAMIE, and ELLEN
WHEELER,

        Plaintiffs-Appellants,

v                            No. 138401

LANSING BOARD OF EDUCATION and
LANSING SCHOOL DISTRICT,

        Defendants-Appellees.

_____

HATHAWAY, J. (*concurring*).

I fully concur with Justice CAVANAGH's analysis and conclusion in this matter and I support overruling *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001). Further, I agree with the additional criticisms of *Lee* articulated in Justice WEAVER's thoughtful concurrence. I write separately to express my thoughts on the doctrine of stare decisis.

Given the debate amongst the justices of this Court concerning what constitutes the proper stare decisis analysis, I find it insightful to review how our United States Supreme Court has treated the doctrine. Stare decisis is a principle of policy that commands judicial respect for a court's earlier decisions and the rules of law that they embody. See *Harris v United States*, 536 US 545, 556-557; 122 S Ct 2406; 153 L Ed 2d

524 (2002); *Helvering v Hallock*, 309 US 106, 119; 60 S Ct 444; 84 L Ed 604 (1940).

"*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v Tennessee*, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). However, when balancing the need to depart from precedent with the need to adhere to established precedent, it is important to bear in mind that stare decisis is neither an "inexorable command," *Lawrence v Texas*, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor "a mechanical formula of adherence to the latest decision," *Helvering*, 309 US at 119. "If it were, *segregation would be legal, minimum wage laws would be unconstitutional, and the Government could wiretap ordinary criminal suspects without first obtaining warrants.* See *Plessy* v. *Ferguson*, 163 U. S. 537 [16 S Ct 1138; 41 L Ed 256] (1896), overruled by *Brown* v. *Board of Education*, 347 U. S. 483 [74 S Ct 686; 98 L Ed 873] (1954); *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525 [43 S Ct 394; 67 L Ed 785] (1923), overruled by *West Coast Hotel Co.* v. *Parish*, 300 U. S. 379 [57 S Ct 578; 81 L Ed 703] (1937); *Olmstead* v. *United States*, 277 U. S. 438 [48 S Ct 564; 72 L Ed 944] (1928), overruled by *Katz* v. *United States*, 389 U. S. 347 [88 S Ct 507; 19 L Ed 2d 576] (1967)." *Citizens United v Fed Election Comm*, 558 US __, __; 130 S Ct 876, 920; 175 L Ed 2d 753, 806 (2010) (Roberts, C.J., concurring).

I too believe that stare decisis is a principle of policy. As stated in *Helvering*:

> We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a

principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.[1]

I do not agree with any approach to stare decisis that suggests or implies that it is a "rule" or "law" subject to a particularized test to be used in all circumstances. Any particular approach to stare decisis, such as the one taken in *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), is not "law" or "established precedent" that would require us to overrule, reject or modify its analysis. The *Robinson* approach to stare decisis, just as the one taken in *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009), is one among many varying approaches, and no particular approach, in and of itself, is inherently superior to another. As with any policy determination, the approach taken in any given case will depend on the facts and circumstances presented.

Historically, the United States Supreme Court has utilized many different approaches to stare decisis, including such approaches as those involving a "compelling justification,"[2] "special justification,"[3] and a determination that a case was "wrongly decided."[4] Each of these approaches is valid and offers a different nuance to stare decisis

---

[1] *Helvering*, 309 US at 119.

[2] *14 Penn Plaza LLC v Pyett*, 556 US ___, ___; 129 S Ct 1456, 1478; 173 L Ed 2d 398, 425 (2009).

[3] *Arizona v Rumsey*, 467 US 203, 212; 104 S Ct 2305; 81 L Ed 2d 164 (1984).

[4] *Seminole Tribe of Florida v Florida*, 517 US 44, 66; 116 S Ct 1114; 134 L Ed 2d 252 (1996).

3

consideration.[5]  However, because stare decisis is a policy consideration, which must be considered on a case-by-case basis, the particular analytical approach will differ from case to case.  Most importantly, the critical analysis should be on the rationale regarding whether or not to change precedent.

It is also worthy to note that not only has the United States Supreme Court historically not taken one single approach to the application of stare decisis, the Court has not felt compelled to discuss stare decisis in all cases when precedent is being overturned. Many landmark cases that overruled well-established precedent did not discuss or even mention the phrase "stare decisis."  For example, *Brown* overruled *Plessy*, thereby ending segregation in our public schools, without mentioning the phrase "stare decisis," much less articulating and following a particularized test.  Similarly, *Gideon v Wainwright*, 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), which established the rights of indigents to have counsel in all criminal cases, not merely capital offenses, overruled *Betts v Brady*, 316 US 455; 62 S Ct 1252; 86 L Ed 1595 (1942), again without mentioning "stare decisis" or a particularized test.  Instead, both of these cases focused on the important policy considerations that weighed in favor of overruling precedent.[6]

---

[5] Any of these approaches to stare decisis can be valid depending on the issues before the court.  However, the factors used in any of these tests may or may not be applicable in any given case.

[6] See Supreme Court Decisions Overruled By Subsequent Decisions, available at <http://www.gpoaccess.gov/constitution/pdf2002/048.pdf> (accessed July 28, 2010), for a partial list of United States Supreme Court cases (covering the period from 1810 to 2001) that overrule precedent.  Numerous additional examples can be found on this list of

4

With these principles in mind, any analysis of the impact of stare decisis must focus on the individual case and the reason for overruling precedent. Thus, the reasons for overruling *Lee* are paramount to any articulated test and the special and compelling justifications to do so are overwhelming in this case. As I agree with the well articulated reasons expressed by Justice CAVANAGH and Justice WEAVER, I will not repeat them here.

Diane M. Hathaway

---

cases that do not mention or discuss the phrase "stare decisis" despite the fact that the case overrules precedent.

S T A T E   O F   M I C H I G A N

SUPREME COURT

LANSING SCHOOLS EDUCATION
ASSOCIATION, MEA/NEA, CATHY
STACHWICK, PENNY FILONCZUK,
ELIZABETH NAMIE, and ELLEN
WHEELER,

          Plaintiffs-Appellants,

v                              No. 138401

LANSING BOARD OF EDUCATION and
LANSING SCHOOL DISTRICT,

          Defendants-Appellees.

---

BEFORE THE ENTIRE BENCH

CORRIGAN, J. (*dissenting*).

I dissent.  In one fell swoop, the majority permits unlimited interference by courts in the local educational process and rewrites the entire constitutionally based legal doctrine governing standing in Michigan.  Contrary to the majority's decision, the lower courts correctly concluded that the plaintiff teachers here have no statutory right to demand the permanent expulsion of four particular children, and potentially innumerable other children, from all Michigan schools.  Under any meaningful test for standing, plaintiffs cannot enlist the courts to compel locally elected school districts to expel students under the circumstances presented here.

The majority reverses the lower courts' rulings, however, by creating a vague new standing "test"—which is really no test at all—that violates the constitutional separation of powers mandate and gives courts unbounded discretion to overturn the decisions of other branches of government. In its haste to overrule this Court's standing jurisprudence, instead of addressing the issues framed by the parties, the majority asks and answers a question solely of its own making: whether *Lee v Macomb Co Bd of Comm'rs*, 464 Mich 726; 629 NW2d 900 (2001), was correctly decided.[1] In doing so, the majority jettisons years of binding precedent on the basis of four justices' current estimation that the public would be better served by opening the courts to all manner of challenges to acts of the legislative and executive branches. In overruling numerous cases, the majority throws into question the analyses and results in *no fewer than eight* significant, precedent-setting disputes including: *Manuel v Gill*, 481 Mich 637; 753 NW2d 48 (2008); *Rohde v Ann Arbor Pub Sch*, 479 Mich 336; 737 NW2d 158 (2007); *Mich Chiropractic Council v Comm'r of the Office of Fin & Ins Servs*, 475 Mich 363; 716 NW2d 561 (2006); *Associated Builders & Contractors v Dep't of Consumer & Indus Servs Director*, 472 Mich 117; 693 NW2d 374 (2005); *Mich Citizens for Water Conservation v Nestlé Waters North America Inc*, 479 Mich 280; 737 NW2d 447 (2007);

---

[1] The parties addressed this issue only after the majority directed them to do so in this Court's order granting plaintiffs' application for leave to appeal. *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 485 Mich 966 (2009). Before this order issued—indeed, from the inception of this case—the parties agreed that *Lee* was the governing legal authority; each side affirmatively argued that *Lee* controlled and urged that *Lee* supported its position.

2

*Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608; 684 NW2d 800 (2004); *Crawford v Dep't of Civil Serv*, 466 Mich 250; 645 NW2d 6 (2002); and, of course, *Lee* itself.

Moreover, in concluding that plaintiffs have standing here, the majority illustrates the fundamental problem with its approach: it adopts no meaningful limitations for a binding doctrine that applies in *every* civil lawsuit brought in this state. Here it opens the courthouse doors for any school teacher, volunteer, contractor or student to demand that a court expel children from their schools even though a local school board has concluded that expulsion was inappropriate. The majority thus authorizes courts not only to invade the provinces of school districts and the state board of education, but also to deprive children of their rights to public education without affording them any due process protections or legal representation. Indeed, none of the children targeted for expulsion are even named as parties in this suit. It is unfathomable that a court nonetheless has the power to permanently expel them from school—yet the majority so holds.

Critically, in overruling the entire body of Michigan's existing standing jurisprudence, the majority eschews the clear understanding of the "judicial power" held by the framers of our state constitution. It also eliminates our workable, principled standing test, which mirrors that of the federal courts and of many state courts *with constitutions similar to our own*. Indeed *no* state in the union incorporates explicit "case or controversy" language into its constitution, yet many states explicitly employ the federal test—which is rooted in the traditional case or controversy requirement—that we adopted in *Lee*.

3

Finally, in effecting these unprecedented changes to Michigan's standing jurisprudence, the majority ignores the doctrine of stare decisis while paying lip service to it. The majority inexplicably concludes that *Lee* was clearly wrongly decided, and that "*Lee* and its progeny departed dramatically from historical jurisprudence," although each member of the current majority who served on this Court during the relevant time period—Justice CAVANAGH, Chief Justice KELLY, and Justice WEAVER—adopted *Lee* as the correct test at some point in the past.[2]

For each of these reasons, I vigorously dissent. I would affirm the decision of the Court of Appeals, which faithfully and appropriately applied the law of this state in concluding that plaintiffs did not have standing to pursue this action.

## I. THE QUESTION PRESENTED

This case, brought by four Lansing teachers and their union, originally presented a straightforward question: can a teacher sue a school board for its failure to expel a student who allegedly assaulted that teacher? To be clear, this case does not ask whether the public has an interest in the welfare of its teachers; our desire for their safety is indisputable. Nor does the case ask whether § 1311a of the Revised School Code, MCL 380.1 *et seq.*, requires a school board to expel a student who "commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the

---

[2] See *Associated Builders,* 472 Mich at 126-127 (WEAVER, J.); *Lee,* 464 Mich at 750 (KELLY, J., dissenting, joined by CAVANAGH, J.)*; Detroit Fire Fighters Ass'n v Detroit,* 449 Mich 629, 651-652; 537 NW2d 436 (1995) (CAVANAGH, J., dissenting in part and concurring in part).

4

school board," MCL 380.1311a(1); the parties do not dispute the unambiguous language of this provision. Further, the defendant school board and school district do not argue that they may ignore this mandate despite their conclusion following a student disciplinary proceeding that a student committed a physical assault as defined by the code. Rather, the parties dispute whether plaintiffs have standing to intervene, by way of a collateral civil suit, when they disagree with defendants' underlying decision that the acts of the students at issue did not constitute physical assaults for purposes of applying the mandatory expulsion provision of MCL 380.1311a(1).

Accordingly, this case specifically asks whether the *courts* may decide, at the behest of a particular teacher, that a school board *must* permanently expel a particular student without any notice to the student or his parents. The plaintiff teachers argued that they should be empowered to seek a court order directing permanent expulsion of students under MCL 380.1311a(1). The majority agrees and holds, under its broad new standard, that plaintiffs have standing to proceed.

This holding is contrary both to settled principles of law regarding when a party has statutory and constitutional standing to bring a claim, as well as to the result demanded by the particular facts and circumstances of this case. The School Code itself clearly establishes that the mandate in MCL 380.1311a(1) is to be enforced by the state executive branch and the locally elected school boards. Moreover, it is for the school districts—not the courts or individual teachers—to decide whether a particular student committed an assault requiring expulsion. Plaintiffs offer no justification for the judicial

5

branch to usurp these powers, which are specifically delegated to other branches of government.

Finally, plaintiffs have *never* described how the courts could successfully intervene. Their analysis fails to account for the fact that a board's decision to expel a student occurs only after a disciplinary proceeding where the *student's* constitutional rights are protected and where the board must make a careful, discretionary, factual decision concerning whether the student had the requisite intent to commit a "physical assault" as defined by the school code. According to the Michigan Association of School Boards, more than 100,000 such disciplinary proceedings occur in Michigan each school year. Yet plaintiffs seek to intervene after the fact in a case where the students are not represented, asking the Court to revisit and overrule innumerable decisions of the elected school boards. Moreover, plaintiffs never explain why other enforcement mechanisms—including not only the explicit statutory enforcement provisions, but also negotiations with the school board under their collective bargaining agreement—are inadequate to ensure appropriate enforcement of the applicable statute.

Thus, like the lower courts, I cannot conclude that teachers have standing to obtain court orders compelling expulsion of students in contravention of a school board's decision that the students' acts did not require expulsion. Perhaps most significantly, by choosing to overrule this Court's constitutional standing doctrine *sua sponte*, the majority gives the courts carte blanche to invade the school board's decision-making province, depriving those boards of their constitutionally delegated responsibilities and depriving students of their rights to public education without affording them due process. This case

6

thus illustrates the absolutely untenable nature of the majority's new approach—an approach that, unfortunately, is characteristic of the majority's assault on the rule of law.

## A.  LOCAL SCHOOL DISTRICTS AND THE REVISED SCHOOL CODE

### 1.  GENERAL POWERS AND DUTIES OF SCHOOL DISTRICTS

The Revised School Code, originally enacted in 1976,[3] describes the "rights, powers, and duties" of school districts.  MCL 380.11a(3).  The powers and duties originate from the Michigan Constitution, which established that the "legislature shall maintain and support a system of free public elementary and secondary schools . . . ."  Const 1963, art 8, § 2.  Consistent with this mandate, the Legislature enacted the school code and provided that school districts would be governed by locally elected school boards.  MCL 380.11a(5), (7).  The constitution also vested "[l]eadership and general supervision over all public education" in the elected members of the state board of education.  Const 1963, art 8, § 3.

Significantly, both the constitution and the school code make plain that school districts' central purposes are the education and protection of students.  Const 1963, art 8, § 2, requires a system of free public schools and states simply:  "Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."  The school code, in turn, defines district functions to include "[e]ducating pupils," MCL 380.11a(3)(a), and "[p]roviding for the safety and welfare of pupils while at school or a school sponsored activity or while en route to or

_____

[3] 1976 PA 451.

7

from school or a school sponsored activity," MCL 380.11a(3)(b). A district's functions with regard to employees, however, center on "[h]iring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others to carry out school district powers." MCL 380.11a(3)(d).

## 2. DISCIPLINARY POWERS AND DUTIES OF SCHOOL DISTRICTS

School districts' powers and duties with regard to students include disciplinary measures subject to varying degrees of discretion by the board and its employees. For example, a district has discretion to suspend or expel a student who is "guilty of gross misdemeanor or persistent disobedience if, in the judgment of the school board or its designee, as applicable, the interest of the school is served" by suspension or expulsion. MCL 380.1311(1). A school board must permanently expel[4] a student under certain circumstances, including possession of a weapon (subject to some exceptions), arson, or criminal sexual conduct on school grounds. MCL 380.1311(2). Even under these circumstances, however, the student or his parent may petition for reinstatement to public education when a period of up to 180 days has elapsed after his expulsion. MCL 380.1311(5).

The statutory provision at issue in this case, MCL 380.1311a(1), was added to the school code by the Legislature in 1999 as one of several bills—including the safe schools

---

[4] Permanent expulsion generally means that a student may not attend any public school in Michigan. But expelled students may be eligible to attend alternative education programs and strict discipline academies or to receive in-home instructional services. MCL 380.1311(3).

8

and communities law, 1999 PA 23—addressing school safety and student discipline.[5] The 1999 bills mandated a statewide school safety information policy to be collaboratively adopted by the Superintendent of Public Instruction, the Attorney General, and the director of the Department of State Police. MCL 380.1308(1). The bills also enacted guidelines for student discipline under various circumstances and established strict discipline academies, MCL 380.1311b, for particular students, including those expelled from their regular public schools, MCL 380.1311g(3)(b), (c).

MCL 380.1311a(1) requires permanent expulsion "[i]f a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board" and the assault is properly reported to school officials. For purposes of this section, "physical assault" means "intentionally causing or attempting to cause physical harm to another through force or violence." MCL 380.1311a(12)(b).

### 3. ENFORCEMENT

The school code's provisions are enforced by several mechanisms. First, school board members, school officials, and any "other person who neglects or refuses to do or perform an act" required by the code, or "who violates or knowingly permits or consents to a violation" of the code, is subject to misdemeanor prosecution. MCL 380.1804. Second, under MCL 380.1806, a school board "may dismiss from employment and cancel the contract of a superintendent, principal, or teacher who neglects or refuses to

---

[5] 1999 PA 102 to 104; 1999 PA 23.

9

comply" with the code. Third, because the members of school boards and the state board of education are elected officials, their acts and policies are regularly reviewed—and accepted or rejected—by the electorate.

It is also significant that the Legislature has enacted a comprehensive, carefully monitored scheme to address safety within our schools. For example, the statewide school safety information policy requires school officials to report various school incidents to law enforcement agencies for investigation. MCL 380.1308(2)(a), (3). Incidents that require reporting under this section are defined by members of the executive branch, MCL 380.1308(1), "taking into account the intent of the actor and the circumstances surrounding the incident," MCL 380.1308(2)(b). School boards are required to submit reports that state the number of students expelled during each year and the reasons for expulsion, MCL 380.1310a(1), and list crimes including those "involving physical violence," committed at schools, MCL 380.1310a(2). These reports are ultimately intended, in part, to help policymakers, school districts, communities, and law enforcement officials "identify the most pressing safety issues confronting their school communities," "enhance campus safety through prevention and intervention strategies," "prevent further crime and violence and . . . assure a safe learning environment for every pupil." MCL 380.1310a(2)(c), (d). Finally, it is noteworthy that many school districts are now empowered to create law enforcement agencies within their school systems. MCL 380.1240.

## B.  TEACHERS' STANDING TO SUE UNDER
## SECTION 1311a OF THE REVISED SCHOOL CODE

## 1.  STANDING AND GROUNDS FOR COURT INTERVENTION

Despite the Legislature's comprehensive system, through which executive branch officials and local districts set evolving policies and monitor responses to school safety, the plaintiff teachers here ask the courts to intervene and dictate the Lansing School District's responses to four past incidents—and potentially innumerable future incidents—involving student misbehavior.  Each of the named plaintiffs alleges that she was physically assaulted by a middle school student[6] and, therefore, that the court should order permanent expulsion of each student under MCL 380.1311a(1).  Plaintiffs further asked the court to: permanently enjoin defendants from violating MCL 380.1311a in the future; find school officials and board members guilty of misdemeanors for violating the school code under MCL 380.1804; and cancel the contracts of the superintendent and any principal for failing to comply with the school code under MCL 380.1806.

Plaintiffs sought this relief by requesting a declaratory judgment under MCR 2.605, which permits a court to "declare the rights and other legal relations of an

---

[6] Plaintiffs allege that one student threw a leather wristband with metal spikes, which hit a bulletin board "about two inches" from the plaintiff teacher's head, bounced, and hit the teacher in the face.  Plaintiffs further allege that two students separately hit plaintiff teachers with chairs.  Each teacher suffered bruises as a result.  A fourth student allegedly slapped a plaintiff teacher on the back with enough force to cause stinging and to leave a pink mark.  Plaintiffs state that each of these incidents was properly reported to school officials and *each student was suspended* but not expelled.  The parties agree that the defendant school board apparently concluded that none of the four students named in the complaint committed "physical assaults" as defined by the code and, therefore, expulsion was *not* mandated by MCL 380.1311a(1).

interested party seeking a declaratory judgment . . . ." MCR 2.605(A)(1). They also sought a writ of mandamus under MCR 3.305, which requires a plaintiff to prove "it has a clear legal right to performance of the specific duty sought to be compelled and the defendant has a clear legal duty to perform such act." *Baraga Co v State Tax Comm*, 466 Mich 264, 268; 645 NW2d 13 (2002) (quotation marks and citations omitted). Defendants moved for summary dismissal of plaintiffs' complaint, arguing that plaintiffs did not have standing to seek either remedy.

Traditional standing principles apply to plaintiffs seeking declaratory relief, *Associated Builders,* 472 Mich at 125, or writs of mandamus, e.g. *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995). As this Court explained in *Associated Builders*, addressing declaratory actions:

> "[I]f a court would not otherwise have subject matter jurisdiction over the issue before it or, if the issue is not justiciable because it does not involve a genuine, live controversy between interested persons asserting adverse claims, the decision of which can definitively affect existing legal relations, a court may not declare the rights and obligations of the parties before it." [*Associated Builders*, 472 Mich at 125, quoting *Allstate Ins Co v Hayes*, 442 Mich 56, 66; 499 NW2d 743 (1993).]

Accordingly, *Associated Builders* explicitly held, in an opinion authored by Justice WEAVER, that the test enunciated in *Lee*, 464 Mich 726, governs standing in declaratory actions and, as here, in actions where a plaintiff seeks to enforce an alleged statutory right but the statute does not confer standing by its own terms. *Associated Builders*, 472 Mich at 127 n 16. Therefore, until today, plaintiffs bore the burden of establishing each of the following elements of standing in order to invoke court jurisdiction:

12

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." [*Lujan v Defenders of Wildlife*, 504 US 555, 560-561; 112 S Ct 2130; 119 L Ed 2d 351 (1992) (citations omitted); quoted and adopted by *Lee*, 464 Mich at 739; quoted and applied to declaratory actions in *Associated Builders*, 472 Mich at 126-127.]

Here plaintiffs have not established a legally protected interest in, or clear legal right to, expulsion of students under MCL 380.1311a(1). Plaintiffs also have not shown that defendants had a clear legal duty to expel the students under the facts presented or that plaintiffs' interests can be addressed by a favorable court decision. Therefore, they cannot establish standing to seek relief against the school board under MCL 380.1311a(1).

2. THE ALLEGED RIGHT TO RELIEF ASSERTED BY PLAINTIFFS

Plaintiffs argue that the text of MCL 380.1311a(1) creates an enforceable right in teachers and a corresponding duty owed by school districts to teachers. To determine whether a plaintiff has standing created by a statute, the court begins by considering "the statutory language to determine legislative intent." *Miller v Allstate Ins Co*, 481 Mich 601, 610; 751 NW2d 463 (2008). As an initial matter, many of the cases cited by plaintiffs on this point are inapposite because they address whether a statute creates or

13

implies a right of action for damages against a *private* party.[7]  The inquiry is different when, as here, a governmental agency is involved.  Because governmental agencies are generally immune from suit under the governmental tort liability act, MCL 691.1407,[8] a plaintiff may sue a governmental agency for damages only when the Legislature *expressly* so authorizes.  *Lash v Traverse City*, 479 Mich 180, 194; 735 NW2d 628 (2007); *Mack v Detroit*, 467 Mich 186, 195-196; 649 NW2d 47 (2002).  These cases do not establish that a plaintiff may infer a private cause of action for damages against a governmental agency.  Rather, in a suit against a governmental agency, a plaintiff generally may seek only injunctive or declaratory relief upon showing that the particular plaintiff has a clear, legally enforceable right that the particular defendant had a duty to protect.  *Lash*, 479 Mich at 196.

Some of the relief requested by plaintiffs is clearly unavailable because they improperly ask the court to require the executive branch and the school district to make

---

[7] E.g. *Gardner v Wood*, 429 Mich 290, 312-314; 414 NW2d 706 (1987) (finding no implied cause of action against a private party for violating a provision of the former Liquor Control Act, MCL 436.26c); *Pompey v Gen Motors Corp*, 385 Mich 537, 552-553, 560; 189 NW2d 243 (1971) (permitting suit against a private employer for violation of the plaintiff's statutorily created civil rights); *Lane v KinderCare Learning Ctrs, Inc*, 231 Mich App 689, 695-696; 588 NW2d 715 (1998) (finding no implied cause of action against a private party for violating the child care organizations act, MCL 722.111 *et seq.*).

[8] A school district, its board members, and its employees generally qualify for governmental immunity.  See MCL 691.1407(1), (2) (establishing that a "governmental agency" and its board members and employees are generally immune from tort liability); MCL 691.1401(b), (d) (defining "governmental agency" to include a "political subdivision" of the state and defining "political subdivision" to include school districts).

discretionary decisions *in a particular manner*. Although a plaintiff may seek to compel the *exercise* of discretion through a writ of mandamus, he may *not* compel the exercise of discretion "*in a particular manner.*" *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 666; 425 NW2d 80 (1988) (emphasis added). Courts are not empowered to require the school board to cancel an employee's contract for failing to comply with the school code. Rather, MCL 380.1806 clearly establishes that a decision to terminate an employee under these circumstances lies within the board's discretion because the statute states that the board "may" dismiss an employee for violating the code. A statute's use of the word "may" in this context conveys discretion to act, it does not *require* the act. See *Warda v Flushing City Council*, 472 Mich 326, 332; 696 NW2d 671 (2005). Similarly, a court has no power to find individual officials guilty of misdemeanors under MCL 380.1804 in this civil case. "The power to determine whether to charge a defendant [with a criminal offense] and what charge should be brought is an executive power, which vests exclusively in the prosecutor." *People v Gillis*, 474 Mich 105, 141 n 19; 712 NW2d 419 (2006); Const 1963, art 3, § 2.[9] Indeed, not only is this a civil case, but plaintiffs failed to name any individual defendants, so no potentially liable individuals are even parties against whom relief may be sought.

---

[9] And see *People v Chavis*, 468 Mich 84, 94 n 6; 658 NW2d 469 (2003): "It is invariably the case that the prosecutor always has great discretion in deciding whether to file charges. Such executive branch power is an established part of our constitutional structure." The prosecutor's powers in this regard are tempered by "systemic protections afforded defendants" incident to criminal trials and by "elections, which call all office holders to account to their constituents." *Id.*

Accordingly, the only obtainable relief sought by plaintiffs depends on their argument that they have a clear, legally protected right to the expulsion of the four students described in the complaint and, potentially, to innumerable future students. They stress that MCL 380.1311a(1) addresses assaults on a specific, circumscribed group of people—any "person employed by or engaged as a volunteer or contractor by the school board"—that includes teachers like themselves. But nothing in the code suggests that the statute therefore creates an enforceable right in, or a duty to, this group of people. As explained above, the text of the 1999 statutory amendments is aimed at creating a comprehensive, statewide program of student discipline governed by the state board of education and the local districts. There is no indication of a legislative intent to create new rights in teachers beyond their explicit statutory and contract rights.[10]

Plaintiffs cite two cases in which courts entertained suits brought by teachers who sought interpretation of school code provisions: *Detroit Federation of Teachers v Detroit Bd of Ed*, 396 Mich 220; 240 NW2d 225 (1976) (addressing the former code that predated the 1976 revised code), and *Roek v Chippewa Valley Sch Dist*, 122 Mich App 76; 329 NW2d 539 (1982). In *Detroit Federation of Teachers*, this Court agreed with the circuit court's declaratory decision stating that the defendant board "shall enter into a written, individual contract with each 'duly qualified' teacher in its employ" because

---

[10] The only authority plaintiffs cited to support their oft-stated conclusion that MCL 380.1311a(1) was specifically intended to protect employee safety is HB 5802, which became 2000 PA 230. But 2000 PA 230 did not enact MCL 380.1311a, as plaintiffs incorrectly assumed.

16

written contracts with teachers were required by former MCL 340.569, but we concluded that the lower courts erred by directing the kind of contract individual teachers would receive. 396 Mich at 222, 226. In *Roek*, the Court resolved the parties' dispute over language in MCL 380.1236(2), concluding on the basis of undisputed facts that the plaintiff qualified, as a matter of law, as a teacher employed as a substitute teacher for 120 days or more during a school year and thus had the basic right to be given first opportunity to accept or reject a contract under certain circumstances. 122 Mich App at 78-79. Neither of these cases supports plaintiffs' claim for standing here.

These cases were concerned with teachers seeking judicial action with regard to *teacher* contracts. Thus, the cases addressed issues germane to teachers as *direct* parties to statutorily specified employment relationships. Moreover, because the cases involved the defendants' duties to teachers in the employment context, the subject matter fell directly within the scope of specified district functions with regard to employees, which include "contracting." MCL 380.11a(3)(d). More importantly, *Detroit Federation of Teachers*, in particular, is most significant for what it did *not* do. Although *Detroit Federation of Teachers* confirmed the mandatory requirement for written contracts under the school code, it reversed the circuit court's writ of mandamus "directing the kind of contract particular teachers would receive." 396 Mich at 224. It concluded that the "right protected by the code is the right to a written contract evidencing the employment relationship, not to a particular kind of contract." *Id.* at 227. Accordingly, the court had no power to govern the details of the parties' contractual powers and duties, which the

17

statute left to be determined through their collective bargaining process or the grievance procedure provided by their collective bargaining agreement. *Id.*

The case before us does not arise from the parties' request for the court to interpret, as a matter of law, mandatory statutory language addressing teacher contracts. Rather the parties agree that the statutory language is unambiguous and needs no further interpretation. Instead, plaintiffs asked the court to revisit a school board's discretionary *factual* decision as it relates to a disciplinary scheme governing defendants' responses to *student* behavior in *student* disciplinary proceedings. Thus, instead of supporting plaintiffs' argument, the holdings of *Detroit Federation of Teachers* and *Roek* depend on contrasting facts and illustrate that this case does *not* involve a statute creating a clear right in plaintiffs or a clear duty on defendants' part as their employer.

Crucially, plaintiffs' reasoning is by no means limited to teachers. Upon accepting plaintiffs' claim that they have an enforceable right under MCL 380.1311a(1), the majority establishes that *every* person mentioned in the student disciplinary statutes now has standing to challenge a decision of a school board declining to expel a student who is accused of assault. As previously discussed, MCL 380.1311a(1) addresses disciplinary measures with regard to students who assault school employees, volunteers, and contractors. MCL 380.1310(1), in turn, addresses disciplinary measures when a "pupil enrolled in grade 6 or above commits a physical assault at school against another pupil." The two provisions are similarly worded and, therefore, the majority's conclusion that the teachers have standing to sue here applies with equal force not only to other school employees, volunteers and contractors, but to every student who alleges he was

18

physically assaulted by another student. Yet nothing in the school code indicates that the Legislature intended to create a new right in *all* school volunteers, contractors, employees, or students to compel the expulsion of students, thus opening the floodgates for—and overwhelming the courts with—collateral litigation whenever one such person is dissatisfied with a board's resolution of a student disciplinary proceeding. For these reasons, plaintiffs simply have not met their burden to show that the Legislature intended to create a legally protected right in teachers when it enacted MCL 380.1311a(1).

## 3. PLAINTIFFS' REMEDIES

Plaintiffs' claims fail primarily for the above reason: the Revised School Code does not clearly create legal rights in teachers to compel expulsion of students under MCL 380.1311a(1). But plaintiffs have also failed to show that the Legislature intended to authorize private suits to enforce MCL 380.1311a(1) or that the other statutory enforcement mechanisms are not exclusive under these circumstances. These latter failures independently defeat plaintiffs' claim that judicial relief is available to them in this case.

With regard to plaintiffs' mandamus complaint, relief is available *only* if "the law has established no specific remedy" for a duty created by law. *Houghton Sch*, 430 Mich at 667. The cases cited by plaintiffs similarly hold that, when a right or duty is imposed by statute, "the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive." *Pompey*, 385 Mich at 552. As already discussed, the Legislature clearly vested enforcement of the code and its provisions in the executive branch, through misdemeanor prosecutions under MCL 380.1804, and local

school districts, which have discretionary power to terminate employees and officials who violate the terms of the code, MCL 380.1806. With regard to school safety, the code provides an additional layer of local and executive branch monitoring and enforcement through the statewide school safety information policy, MCL 380.1308, and reporting requirements, MCL 380.1310a. Thus, the code's express terms provide particular remedies applicable to MCL 380.1311a. This should end the inquiry; these remedies generally should be deemed exclusive.

Plaintiffs argue, nonetheless, that they may still seek declaratory or mandamus relief if the statutory remedies are inadequate. This Court has never accepted the argument that courts may create new remedies for the violation of statutory duties on the basis of a party's claim that existing statutory remedies are inadequate. In *Lash*, this Court rejected the argument—which is rooted in dictum from *Pompey,* 385 Mich at 552 n 14—that an additional remedy might be permitted to supplement a statutory remedy if the statutory remedy is "plainly inadequate"; we noted that this dubious principle "has never since been cited in any majority opinion of this Court" and "appears inconsistent with subsequent caselaw." *Lash*, 479 Mich at 192 n 19. Plaintiffs nonetheless suggest that the principle was followed in a Court of Appeals case, *Lane*, 230 Mich App 696, which cited *Pompey* and *Long v Chelsea Community Hosp*, 219 Mich 578, 583; 557 NW2d 157 (1996), for the proposition that "a cause of action can be inferred from the fact that the statute provides no adequate means of enforcement of its provisions." Yet *Lane* itself concluded that the plaintiff could *not* bring suit in part because the act at issue—the child care organizations act, MCL 722.111 *et seq.*—"adequately provides for enforcement of

20

its provisions" through provisions similar to those present in the school code, including criminal penalties and proceedings instituted by the Attorney General. *Lane*, 231 Mich at 696. Notably, the comparable statutory remedies available in this case are ignored by the majority opinion.

In any event, plaintiffs certainly have not shown that the available enforcement mechanisms are inadequate. In addition to the statutory mechanisms discussed above—and in addition to the fact that school board members, as elected officials, must answer to the public for their acts and policies—plaintiffs never address why their contractual bargaining process is inadequate to address their safety concerns. Indeed, plaintiffs *concede* that their bargaining agreement with defendants includes provisions to protect the workplace safety of its members.[11] Thus, consistent with the code's acknowledgment of the *contract*-based relationship between a teacher and a school district, it appears clear that plaintiffs not only have an enforcement mechanism at hand but—as in *Detroit Federation of Teachers* with regard to the non-justiciable contract terms—may make use of their bargaining process or grievance procedure to address alleged violations of their alleged rights to workplace safety. Defendants also reasonably argue that plaintiffs are clearly empowered to protect themselves by reporting alleged student assaults to their local prosecutor for criminal investigation.

---

[11] Plaintiffs expressly affirm in their brief that the plaintiff union "has bargained language in its master agreement with Defendants-Appellees to protect the workplace safety of its members."

21

Finally, in light of the broad powers the school code establishes in executive branch officials and local school boards, permitting individual plaintiffs to enforce MCL 380.1311a could violate both the terms of the code and the Michigan Constitution. Although this Court continues to debate the constitutional ramifications of our standing doctrine, we do not disagree about the constitutionally mandated separation of powers among our three branches of government: "No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in th[e] constitution." Const 1963, art 3, § 2. Thus, it is clear that the courts cannot exercise powers expressly allocated to other branches of government. Here, the constitution expressly granted the power to create and supervise public schools to the state board of education, Const 1963, art 8, § 3, and the Legislature, Const 1963, art 8, § 2, which has delegated governance of the schools in part to the local school boards, MCL 380.11a(5), (7). Accordingly, the constitution itself supports the conclusion that courts may not compel acts of the local school boards without express, constitutionally sound authorization to do so. The trial court made this very point in its decision granting summary disposition:

> Basically, the premise here is that this Court in some fashion or another has the right to look behind the exercise of discretion by the Lansing School District. I don't think we have any more right to do that than we have to [sic] the Lansing City Council. The Lansing City Counsel [sic] is another branch of government. It's not our prerogative. That's not—that's not something for the Court to do.

22

## 4. REDRESSABILITY AND THE EFFECTS ON STUDENTS' CONSTITUTIONAL RIGHTS

On a related significant point, plaintiffs offer no workable means by which a court could enforce their alleged rights to expulsion of students under MCL 380.1311a(1) even if the court had some power to intervene through declaratory relief or a mandamus order. Plaintiffs' failure in this regard informs and strengthens the conclusion that the statute does not create legally enforceable rights in, or duties to, plaintiffs at all.

Plaintiffs' complaint depends entirely on their allegation that the four named students committed "physical assaults" as defined by the code. Plaintiffs tacitly proceed as if this allegation was undisputed or could be decided by the court. To the contrary, the parties agree that the factual determination whether a student committed a physical assault for purposes of the school code is a discretionary one for the school board. Although no authority suggests that a teacher has standing to appeal a school board's disciplinary decision with regard to a particular student, the Court of Appeals has concluded that when a *student* appeals such a decision, "in reviewing the disciplinary orders of a school administration, the courts of this state are bound by that administration's factual findings so long as they are supported by competent, material and substantial evidence." *Birdsey v Grand Blanc Community Sch*, 130 Mich App 718, 723-724; 344 NW2d 342 (1983). Thus the courts have imported the highly deferential standard applicable to administrative agencies under Const 1963, art 6, § 28. *Id.* at 723. *Birdsey* also relied on *Wood v Strickland*, 420 US 308, 325; 95 S Ct 992; 43 L Ed 2d 214 (1975), which concluded that a court is bound to accept a school administration's finding

23

of fact if there is any evidence in the record to support it. Despite this deferential standard for *direct* appeals of administrative decisions, both the plaintiffs and the majority would accord *no* deference *in a collateral appeal* to the school board's apparent determination that the four named students did not commit physical assaults as defined by MCL 380.1311a(12)(b).

Although we accept as true the *facts* alleged by a plaintiff in a complaint for purposes of a defendant's motion for summary disposition under MCR 2.116(C)(8), *Kuznar v Raksha Corp*, 481 Mich 169, 176; 750 NW2d 121 (2008), plaintiffs' characterization of each event as a "physical assault" as defined by MCL 380.1311a(12)(b) is a *conclusion* drawn from the statutory terms—not a fact.[12] Accordingly, a court cannot simply accept this allegation as true or presume that, if the case proceeds, it can be resolved in plaintiffs' favor by a finder of fact at trial. Rather, the allegation has apparently already been resolved *to the contrary* by the entity that plaintiffs concede is the proper forum—the school board. Under these circumstances,

---

[12] Compare *Davis v Detroit*, 269 Mich App 376, 379 n 1; 711 NW2d 462 (2006) ("Plaintiff's reliance on her allegation in her complaint that the city was engaged in a proprietary activity is unwarranted because only factual allegations, not legal conclusions, are to be taken as true under MCR 2.116(C)(7) and (8)."). Moreover, although plaintiffs have not properly placed in issue the school board's determinations, I note that the students' alleged acts, see *ante*, ___ do not unquestionably constitute physical assaults under MCL 380.1311a(12)(b), as plaintiffs simply presume. Particularly because the statutory definition of "physical assault" includes a specific intent element—"intentionally causing or attempting to cause physical harm," MCL 380.1311a(12)(b)—the finder of fact at a disciplinary proceeding could conclude, on the basis of the mental state of the student or the circumstances surrounding each assault, that the student did not affirmatively *intend* to cause *physical harm* to his or her teacher.

24

plaintiffs could achieve relief only if they can show, first, that the school board abused its discretion when it determined that the four students' acts did not constitute physical assaults and, second, that the court has the power to conclude that the board erred and then to overturn the board's determination *in a suit brought by teachers*. But plaintiffs never explain whether or how the court could review or overturn the board's determinations in student disciplinary proceedings that have long-since concluded, let alone by way of this collateral suit in which the students at issue are not even represented.

Indeed, all other issues aside, plaintiffs' claims with regard to the four named students appear moot *in any event* because the disciplinary proceedings concluded years ago. The alleged assaults occurred in January 2007, September 2006, May 2006, and October 2005. Even if some of the students are still enrolled in the district, plaintiffs provide no authority suggesting that they could be expelled *now*; had they been expelled at the time of the incidents, by now each of them could have petitioned for reinstatement to public school under MCL 380.1311a(5) (a court may grant a petition for reinstatement beginning 180 days after the date of expulsion, MCL 380.1311a[5][(b]).[13]

With regard to future students, plaintiffs do not explain how a declaratory judgment requiring defendants to comply with MCL 380.1311a(1) would have any effect whatsoever. Whether a student committed a physical assault is determined on a case-by-

---

[13] Further, because it was the *students'* behavior that injured plaintiffs, plaintiffs' prayer for relief with regard to the four named students appears untenable for the simple reason that the alleged injuries were not caused by *defendants'* failure to expel the students *after* the assaults.

25

case basis depending on the particular facts and in accordance with the student's constitutional rights. Therefore, the most a court could do would be to redundantly repeat the undisputed terms of the statute itself: "If a pupil enrolled in grade 6 or above commits a physical assault at school against a person employed by or engaged as a volunteer or contractor by the school board . . . , then the school board . . . *shall* expel the pupil from the school district permanently, subject to possible reinstatement . . . ." MCL 380.1311a(1) (emphasis added). Plaintiffs' claimed relief thus supports defendants' suggestion that what plaintiffs really desire is for the court—or the plaintiffs themselves—to determine whether a "physical assault" occurred for purposes of applying MCL 380.1311a(1).

Finally, as noted, permitting plaintiffs' complaint to proceed here permits *any* person who alleges he is the victim of student misbehavior to independently sue the board when the board concludes that the student's acts did not qualify for mandatory suspension or expulsion. That is, under the majority's analysis, any employee, volunteer, or contractor of the school may now collaterally sue on the basis of assault allegations under MCL 380.1311a(1). And any student may sue, seeking suspension or expulsion of a fellow student, on the basis of assault allegations under MCL 380.1310(1). And these suits may be filed although the student disciplinary proceeding is over and although the accused student's rights are not represented because he is not a party to the lawsuit.

Crucially, neither the majority nor plaintiffs *ever* address the rights of the accused students. Students have a property interest in their entitlement to public education that cannot be "taken away for misconduct without adherence to the minimum procedures

26

required by [the Due Process Clause of the Fourteenth Amendment]," US Const, Am XIV. *Goss v Lopez,* 419 US 565, 574; 95 S Ct 729; 42 L Ed 2d 725 (1975);[14] see also *Birdsey*, 130 Mich App at 726 (applying *Goss*). Accordingly, plaintiffs certainly cannot seek expulsion of students in the present proceeding, where the students are not represented and have no opportunity to contest plaintiffs' allegations against them. *Goss,* 419 US at 579. Yet the majority permits plaintiffs to proceed, thereby rendering *additional* lawsuits—brought by the expelled students claiming violation of *their* rights— inevitable.

### 5. CONCLUSION: PLAINTIFFS CLEARLY LACK STANDING AND THE MAJORITY'S CONCLUSIONTO THE CONTRARY ILLUSTRATES THE FATAL PROBLEMS WITH ITS NEW APPROACH TO STANDING

Plaintiffs have not borne their burden to show that they satisfy *any* of the applicable requirements for standing under *Lee,* as both lower courts correctly concluded. Plaintiffs have not shown that MCL 380.1311a(1) creates a legally protected and redressable interest *in teachers* for which the courts may provide relief, particularly in a case involving only the teachers and the school district, but not the students at issue. Further, the foregoing discussion shows that plaintiffs could not satisfy *any* meaningful standing test.

Indeed, plaintiffs could not assert standing even under the former tests the majority cites with approval. Significantly, the parties essentially agree that the outcome

---

[14] *Goss* applies because Michigan maintains a public school system, Const 1963, art 8, § 2, and requires children to attend, MCL 380.1561. See *Goss,* 419 US at 574.

27

here would be the same whether standing is analyzed under *Lee, Detroit Fire Fighters,* 449 Mich 629, or *House Speaker v Governor,* 443 Mich 560; 506 NW2d 190 (1993). We agree. First, as discussed above, we see no indication that the Legislature intended to create a right or "substantial interest" in *plaintiffs*, see *House Speaker,* 443 Mich at 572, by enacting MCL 380.1311a(1). Further, to the extent plaintiffs refer to their general interest in their personal safety while at work, this interest is separate and independent from the student discipline provisions of the Revised School Code; plaintiffs can protect this interest through all the normal channels, including contract negotiations and complaints to local law enforcement. Second, plaintiffs' general interest in a safe school environment is analogous to the safety interests claimed by the plaintiffs in *Detroit Fire Fighters,* where Justice WEAVER agreed that the plaintiff firefighters and their collective bargaining unit did not have standing to challenge an alleged violation of the Detroit City Charter. *Detroit Fire Fighters,* 449 Mich at 631-632. Justice WEAVER concluded that the firefighters did not have a "substantial interest" that "will be detrimentally affected in a manner different from the public at large" although they claimed that lack of funding for additional firefighters subjected them to increased risk of injury, among other things. *Id.* at 633 (opinion by WEAVER, J.). Specifically, she opined that the plaintiffs could not show "injury distinct from the general citizenry" because a lack of firefighters also threatened injury to members of the general public who occupied buildings that catch fire. *Id.* at 638. The Legislature's purported interests in ensuring safe and effective learning environments similarly benefit the public at large. Safe schools, and the removal of violent students when appropriate, benefit not only all employees, volunteers,

28

contractors and students, but also parents, families, and any other member of the public who has occasion to enter a school. Indeed, the *entire community* that supports a school system has "an interest" in school safety: safe school environments benefit taxpayers, who fund all aspects of school functions. Although not every member of the public is affected *equally* by school environments, the same was true in *Detroit Fire Fighters*; clearly not every member of the public frequently finds himself at risk inside a burning building, and clearly firefighters find themselves inside burning buildings more often than other individual citizens.[15]

Yet the majority rejects this Court's standing test and concludes, without any examination of the school code or the ramifications for students' constitutional rights, that plaintiffs—and, by necessary analogy, all school employees, contractors, volunteers and fellow students—have standing. As I have explained, the school code is replete with clear indications that the Legislature did not intend to create a right of action in teachers under MCL 380.1311a(1) and intended for the school code to be enforced under MCL 380.1804 and MCL 380.1806. The majority concludes otherwise by simply observing that MCL 380.1311a "*suggests* that plaintiffs have a substantial and distinct interest." (Emphasis added.) Then, without citation and contrary to the most essential tenet of statutory interpretation, the majority expressly departs from the statutory text and states

---

[15] Most critically, the disciplinary provisions of the school code name not just teachers, but all employees, contractors, volunteers and students. The statutory language nowhere suggests that the Legislature intended for all these subclasses of the public to bring their individual complaints concerning school boards' disciplinary proceedings to the courthouse.

29

that, although the Legislature has not unambiguously expressed an intent to confer standing, a court may confer standing by consulting legislative history at will.[16] This assertion is indisputably erroneous. The proper interpretation of a statute *always* begins with the unambiguous statutory text. As this Court recently affirmed in a unanimous opinion authored by Chief Justice KELLY, the "first step" in discerning the intent of the Legislature "is to review the language of the statute." *Briggs Tax Service, LLC v Detroit Public Schools*, 485 Mich 69, 76; 780 NW2d 753 (2010). "[W]e consider both the plain meaning of the critical word or phrase as well as "'its placement and purpose in the statutory scheme.'" *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (citation omitted). If the statutory language is unambiguous, we presume that the Legislature intended the meaning expressed in the statute. *Briggs Tax Service,* 485 Mich at 76. Accordingly, as Justice CAVANAGH himself stated in *In re MCI Telecommunications Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999), "judicial construction is neither required *nor permissible*." (Emphasis added.) Further, there has simply never been any question that, to determine whether the Legislature intended to confer standing under a particular statute, we employ the normal rules of statutory interpretation and proceed by "analyz[ing] the statutory language." *Miller*, 481 Mich at 607, 610.

Therefore, as in all cases requiring us to interpret an unambiguous statute, resort to legislative history is inappropriate. *In re Certified Question from US Court of Appeals*

___

[16] *Ante* at ___ n 26.

30

*for Sixth Circuit*, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). Further, even when reference to legislative history is appropriate, staff analyses created within the legislative branch "are entitled to little judicial consideration" because "[i]n no way can a 'legislative analysis' be said to officially summarize the intentions of those who have been designated by the Constitution to be participants in this legislative process, the members of the House and the Senate and the Governor." *Id.*[17] Indeed, the legislative analysis cited here expressly states: "This analysis was prepared by nonpartisan Senate staff for use by the Senate in its deliberations *and does not constitute an official statement of legislative intent*." Enrolled Analysis of SB 0183, SB 0206, HB 4240 and HB 4241, July 21, 1999 (emphasis added).

Thus, the majority grants plaintiffs standing in direct derogation of the Legislature's text and without any attention to the actual rights and remedies at stake, which include the constitutional rights of the unrepresented students. The majority's application of its vague new test demonstrates the test's unprincipled nature and far-reaching consequences. This Court's opinion in *Lee* was aimed precisely at avoiding such consequences by acknowledging that courts do not have unfettered discretion to grant or deny standing at will, but should adhere to a common standard. A common standard prevents the expansion of the judicial power beyond its constitutional bounds

---

[17] Further, contrary to the majority's characterization of such analyses, clearly the pre-enactment statements of a legislative staffer are by no means comparable to statements made by *official, voting delegates* to our constitutional convention, which I reference below.

which, in turn, protects both the rights of citizens and the separate purviews of the other branches of government.

## II. *LEE* WAS CORRECTLY DECIDED AND ITS ARTICULATION OF STANDING IS A NECESSARY COMPONENT OF THIS STATE'S CONSTITUTIONAL JURISPRUDENCE

Relying on decades of developments in federal courts, the United States Supreme Court in *Lujan* set forth three elements so basic to the concept of what is needed for any party to bring a lawsuit that it labeled this standard the "irreducible constitutional minimum" of federal standing jurisprudence. 504 US at 560. First, a party wishing to bring a suit must have suffered a concrete and actual or imminent *injury*. Second, there must be a fairly traceable *causal connection* between the injury and the defendant's conduct. And third, a legal decision in favor of the party must be likely to *redress* the harm. *Id.* at 560-561. By nearly unanimous vote, this Court's decision in *Lee* expressly incorporated this "irreducible constitutional minimum" into our state's existing standing jurisprudence, *Lee*, 464 Mich at 740, in an effort to identify when the courts have the authority to exercise "[t]he judicial power of the state." Const 1963, art 6, § 1. Because the doctrine of standing touches every civil lawsuit brought in this state, it is a doctrine of the utmost importance, with serious constitutional and practical implications.

Unfortunately, none of these considerations has deterred the majority in this case from *reducing* Michigan's standing requirements from the clear, developed standards articulated in *Lee* and its progeny to a broad and amorphous principle that promises to be nearly impossible to apply in a society that operates under the rule of law. The majority does so by relying on arguments and legal theories that have been considered and rejected

32

as inconsistent with Michigan's constitutional requirements. The majority also does so notwithstanding that *Lee* and its progeny provided Michigan with a clear, well-understood standing framework that clarified the law for the better by identifying the proper scope of judicial authority. The majority today upends and reverses this entire body of Michigan law in vindication of the personal views of the majority justices, but to the detriment of this state's constitutional jurisprudence.

### A. STANDING *IS* A CONSTITUTIONAL REQUIREMENT IN MICHIGAN

The Michigan Constitution both separates the powers of the various branches of government and limits the power of the judicial branch to hear cases when actual disputes exist. Thus, standing *is* a constitutional requirement. Because the Constitution vests "[t]he judicial power of the state . . . exclusively in one court of justice," Const 1963, art 6, § 1, the source and boundary of this power is constitutional in nature. *Lee* therefore properly held that federal constitutional standards regarding standing may serve as a benchmark in Michigan.

Perhaps the most fundamental doctrine in American political and constitutional thought is the separation of powers of government into a tripartite system. This principle has been explicitly incorporated in Michigan's constitutions.[18] The importance of distribution of power is reaffirmed explicitly in our current Constitution, which states:

---

[18] See, e.g., Const 1908, art 4, § 1 ("The powers of government are divided into three departments: The legislative, executive and judicial."); *id.* at art 4, § 2 ("No person belonging to 1 department shall exercise the powers properly belonging to another, except in the cases expressly provided in this constitution.").

"The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."[19] Const 1963, art 3, § 2. There can be no doubt, then, that the scope of the judiciary's power is both created and constrained by Michigan's Constitution.

The *Lee* Court did not newly create this constitutional principle out of whole cloth. Contrary to the majority's belief, and inconvenient to the majority's conclusion, Michigan has consistently acknowledged that the state's constitution limits the judicial power to hearing disputes involving *actual* cases or controversies. Understanding this most basic of principles is imperative to defining what, precisely, this state's doctrine regarding "standing" should be because there is a clear link between the doctrine of standing and the separation of powers. The United States Supreme Court made this clear in *Allen v Wright*, 468 US 737; 104 S Ct 3315; 82 L Ed 2d 556 (1984):

> The requirement of standing . . . has a core component derived directly from the Constitution. . . .
>
> * * *
>
> . . . [T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers. . . .

---

[19] The Michigan Constitution also explicitly provides that the Legislature is to exercise the "legislative power" of the state, Const 1963, art 4, § 1, the Governor is to exercise the "executive power," Const 1963, art 5, § 1, and the judiciary is to exercise the "judicial power," Const 1963, art 6, § 1.

> . . . [Q]uestions . . . relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process." [*Id.* at 751-752, quoting *Chicago & G T R Co v Wellman*, 143 US 339, 345; 12 S Ct 400; 36 L Ed 176 (1892), and *Flast v Cohen*, 392 US 83, 97; 88 S Ct 1942; 20 L Ed 2d 947 (1968).]

The Court reaffirmed this principle in *Lewis v Casey*, 518 US 343, 349; 116 S Ct 2174; 135 L Ed 2d 606 (1996), stating that "the doctrine of standing [is] a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." In applying these principles as articulated in the Michigan Constitution, we have previously explained:

> As part of this endeavor to preserve separation of powers, the judiciary must confine itself to the exercise of the "judicial power" and the "judicial power" alone. "Judicial power" is an undefined phrase in our constitution, but we noted in *Nat'l Wildlife* that
>
> "[t]he judicial power has traditionally been defined by a combination of considerations: the existence of a real dispute, or case or controversy; the avoidance of deciding hypothetical questions; the plaintiff who has suffered real harm; the existence of genuinely adverse parties; the sufficient ripeness or maturity of a case; the eschewing of cases that are moot at any stage of their litigation; the ability to issue proper forms of effective relief to a party; the avoidance of political questions or other non-justiciable controversies; the avoidance of unnecessary constitutional issues; and the emphasis upon proscriptive as opposed to prescriptive decision making." [471 Mich at 614-615.]
>
> We went on in *Nat'l Wildlife* to distill this litany of considerations arising from the proper exercise of the "judicial power," and we determined that "the most critical element" is "its requirement of a genuine case or controversy between the parties, one in which there is a real, not a hypothetical, dispute." [*Nestlé Waters*, 479 Mich at 292-293 (brackets in original).]

Moreover, these basic principles have been affirmed time and again by Michigan courts, as this Court traced in *Lee*:

> Concern with maintaining the separation of powers, as in the federal courts, has caused this Court over the years to be vigilant in preventing the judiciary from usurping the powers of the political branches. Early on, the great constitutional scholar Justice THOMAS M. COOLEY discussed the concept of separation of powers in the context of declining to issue a mandamus against the Governor in *Sutherland v Governor,* 29 Mich 320, 324 (1874):
>
> > "Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, while the third must see that the laws are executed. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others. The executive is forbidden to exercise judicial power by the same implication which forbids the courts to take upon themselves his duties."
>
> This position followed from the even earlier iteration of the standing doctrine by Justice CAMPBELL in 1859 when, speaking for this Court, he said:
>
> > "By the judicial power of courts is generally understood the power to hear and determine *controversies* between adverse parties, and questions in litigation." [*Daniels v People*, 6 Mich 381, 388 (1859) (emphasis added).]
>
> Later, in *Risser v Hoyt,* 53 Mich 185, 193; 18 NW 611 (1884), this Court explained:
>
> > "The judicial power referred to is the authority to hear and decide *controversies*, and to make binding orders and judgments respecting them." [Emphasis added.]
>
> More recently, *Johnson v Kramer Bros Freight Lines, Inc*, 357 Mich 254, 258; 98 NW2d 586 (1959), reaffirmed this concept by quoting this portion of *Risser.* [*Lee*, 464 Mich at 737-738 (brackets in original).]

And this history is certainly not exhaustive. For example, in 1920 this Court relied on the separation of powers and the development of judicial power in declaring unconstitutional a statute that would have conferred standing upon citizens to invoke the jurisdiction of the courts "not in the determination of actual controversies where rights have been invaded and wrongs have been done, but in the giving of advice to all who may seek it." *Anway v Grand Rapids R Co*, 211 Mich 592, 606; 179 NW 350 (1920). The Court explained:

> This court and the court from which this case came by appeal draw their power from the Constitution. The power given to both under the Constitution was judicial power. . . . This act confers powers not judicial and requires performance of acts non-judicial in character. For these reasons it is void in its entirety. [*Id.* at 622.]

Following the decision in *Anway*, the Legislature amended the act to remove the offending provisions that had allowed courts to exercise powers outside of the case and controversy context, and this Court upheld the revised act in *Washington-Detroit Theatre Co v Moore,* 249 Mich 673; 229 NW 618 (1930). Notably, the Court found significant that the act had been amended to apply "only to 'cases of actual controversy.'" *Id.* at 676. It concluded that "[t]here must be an actual and *bona fide* controversy as to which the judgment will be *res adjudicata*. Such a case requires that all the interested parties shall be before the court." *Id.* at 677.

In *House Speaker v State Admin Bd*, 441 Mich 547, 556; 495 NW2d 539 (1993), this Court again recognized the indisputable relationship between standing and the separation of powers, holding that "[i]t would be imprudent and violative of the doctrine of separation of powers to confer standing upon a legislator simply for failing in the

37

political process." More recently, in *Federated Publications, Inc v City of Lansing*, 467 Mich 98; 649 NW2d 383 (2002), we reaffirmed and explicitly declared that the "principal duty of this Court is to decide actual cases and controversies." *Id.* at 112, citing *Anway,* 211 Mich at 610, and *In re Midland Publishing Co, Inc,* 420 Mich 148, 152 n 2; 362 NW2d 580 (1984). As this history makes clear, Michigan has consistently acknowledged that our state constitution limits the judicial power to hearing cases involving actual cases or controversies.

This is true notwithstanding the lack of an explicit "case or controversy" requirement in the Michigan Constitution. Indeed, exceptions to the general "case or controversy" limitation on judicial power have been explicitly made in the text of our Constitution itself, thereby recognizing the rule that a case or controversy is otherwise required. For example, Const 1963, art 9, § 32, confers upon "any taxpayer of the state" standing to bring suit to enforce the provisions of the Headlee Amendment. Const 1963, art 11, § 5, empowers "any citizen of the state" to bring injunctive or mandamus proceedings to enforce the civil service laws of the state. Perhaps most significantly, Const 1963, art 3, § 8, allows either house of the Legislature to request that this Court issue an advisory opinion on the "constitutionality of legislation."

Indeed, the delegates' discussion of this last section, when it was ratified at the Constitutional Convention, eliminates any doubt about the framers' understanding of the judicial power in Michigan and directly confirms the *Lee* Court's interpretation of the

judicial power.[20]  In considering whether the Court should have the power to issue advisory opinions in nonadversarial proceedings at the request of other branches of government, the delegates' entire discussion was clearly premised on the *unquestioned assumption* that the judicial power, generally, was rooted in a case or controversy requirement.  At the outset, Delegate Harold Norris explicitly asked with regard to the proposed section:  "Does that mean that as far as this committee is concerned, they do not wish to preserve *the traditional notion that there must be a case or controversy presented before the court may exercise its judicial power*?"  1 Official Record, Constitutional Convention 1961, p 1544 (emphasis added).  When the question was raised whether the power to issue an advisory opinion would be equivalent to the courts' preexisting power to issue declaratory judgments, Delegate Eugene Wanger similarly specified that the courts' preexisting power, even in the arena of declaratory judgments, distinctly required "an actual controversy between individuals . . . ."  *Id.* at 1545.  Delegate Raymond King may have expressed the understanding most clearly when he remarked:

> *We are indeed contemplating a very serious change in what I think to be the history and the tradition of justice in this country*.  Mr. Wanger has pointed out the troubles that the Massachusetts supreme court got into when they allowed themselves *to leave the theory of case and controversy*.  [*Id.* at 1546 (emphasis added).]

---

[20] It is appropriate to consult constitutional convention debates when, as here, "'we find in the debates a recurring thread of explanation binding together the whole of a constitutional concept.'"  *Studier v Michigan Public School Employees' Retirement Bd,* 472 Mich 642, 656; 698 NW2d 350, (2005), quoting *Univ of Michigan Regents v Michigan,* 395 Mich 52, 60; 235 NW2d 1 (1975).

Indeed, even with regard to the limited expansion[21] of judicial power represented by the proposed advisory opinion provision, delegates were expressly concerned that it would "adversely affect[] the separation of powers doctrine . . . ." *Id.* at 1545 (Delegate Wanger); and see *id.* at 1546 (Delegate Jack Faxon indicating that the convention "should be wary of any violation of the separation of powers"); *id.* at 1547 (Delegate King stating: "I think we have established through the English common law and our adherence thereto a system of justice, a system of separation of powers which has proven itself, and I think we ought to be very reluctant at this time to try something new.").

The framers' discussion on these points reinforces the *Lee* Court's understanding of the judicial power and presaged the critical problems—which I express here and which have been expressed by my colleagues in the past—with expanding the judicial power beyond its traditional limit. It also reinforces our conclusion, in *Nat'l Wildlife* that

> [t]o the extent that the people of Michigan, through their constitution, have chosen to confer upon the judiciary three specific authorities potentially beyond the traditional "judicial power," it seems unlikely that the people intended that any other such nontraditional authority could simply be incorporated as part of the "judicial power" by a simple majority of the Legislature. [471 Mich at 625.]

---

[21] The delegates agreed that the constitutional advisory opinion provision was unique and intended to be very limited. For example, Delegate Wanger observed: "It has been emphasized by everyone supporting the advisory opinion practice that the courts will exercise restraint, that they will be very careful not to answer every question that is asked but merely to answer those which are of a very, very vital nature." *Id.* at 1548. Delegate Robert Danhof expressed a similar concern, advocating that the language of the provision should include "an admonition to the supreme court that it is desirable that this particular power be exercised very sparingly and, just as we mean, only upon the most solemn occasions upon very important questions of law." *Id.* at 1549.

In sum, it is clear that the framers of Michigan's constitution believed, first, that the judicial power is generally circumscribed by the case or controversy requirement and, second, that the only way to expand judicial power beyond the traditional case or controversy limitation was through affirmative amendment of the constitution. In accord, this Court has held that the constitutional standing test articulated in *Lee* must not be applied to limit judicial power otherwise expressly conferred in the Michigan Constitution. See *Mich Coalition of State Employee Unions v Mich Civil Service Comm*, 465 Mich 212, 217-219; 634 NW2d 692 (2001).

Yet, since the decision in *Lee*, several members of the current majority have advanced the view that, because the Michigan Constitution does not expressly use the words "case" and "controversy" like the federal constitution, Michigan has no constitutional standing requirement. This argument fundamentally misunderstands both the Michigan and federal constitutions and misapprehends the constitutional standing theory. In *Nat'l Wildlife* we explained that the provisions of the federal constitution describing the limited "cases" and "controversies" that federal courts have the power to hear

> is not a definitional provision that seeks to give meaning to the "judicial power." Rather, art III, § 2 is a provision defining the *limited* judicial power of the federal judiciary, in contrast to the *plenary* judicial power of the state judiciary. The respective legislative articles of the two constitutions are analogous to the judicial articles: the legislative article of the Michigan Constitution does not purport to define the authority of its Legislature (for example, nothing is said therein concerning its authority over marriage, divorce, child custody, child support, alimony, or foster care), while the legislative article of the federal constitution *does* affirmatively confer authority upon the Congress, article I, § 8. The state judicial power, as with the state legislative power, is plenary, requiring no

41

affirmative grant of authority in the state Constitution. The federal judicial power, on the other hand, as with the federal legislative power, is limited. Such power is exclusively a function, or a creation, of the federal constitution, and, therefore, must be affirmatively set forth. In similar fashion, the federal judicial power must also be affirmatively set forth, for it is also a function, or creation, of the federal constitution. Thus, U.S. Const., art. III, § 2 does not *define* the "judicial power;" rather it defines what *part* of the "judicial power" within the United States belongs to the federal judiciary, with the remaining part belonging exclusively to the state judiciary. That art. III, § 2 variously employs the terms "cases" or "controversies" is not to confer a particular meaning upon the "judicial power," but merely is to employ words that are necessary to the syntax of allocating the "judicial power" between the federal and state governments. The concurrence/dissents would confuse the allocation of a power with its definition, and would thereby define the federal "judicial power" in the narrowest possible manner by limiting it through reference *alone* to the existence of a "case." Even from the perspective of the concurrence/dissents, is there *no* more permanent aspect of the "judicial power" than that it pertain to a "case"?

In fact, the "judicial power" in the Michigan Constitution, with the several exceptions enumerated [explicitly in the Constitution], is the same "judicial power" as in the federal constitution, and it is the same "judicial power" that has informed the practice of both federal and state judiciaries for centuries. These historical principles were recognized by *Lee*, and we continue to adhere to them today. [*Nat'l Wildlife*, 471 Mich at 626-628.[22]]

---

[22] In *Nestlé Waters*, we further rejected this argument when a party argued that the Legislature had conferred statutory standing on it, which should be sufficient even if the party could not meet the basic strictures of constitutional standing. We stated:

Justice WEAVER persists in her argument that the textual differences between the federal constitution and our state constitution prove that the exercise of "judicial power" or the doctrine of separation of powers in our constitution means something radically different than it does under the federal constitution. This argument that separation of powers should be understood differently in the Michigan Constitution because the words "case" and "controversy" are not in our constitution suggests to us that Justice WEAVER fundamentally misunderstands the doctrine of separation of powers. She refuses to accept that there is a constitutional limit on the Legislature's authority to expand "judicial power" in the area of standing. In response, we stated in *Nat'l Wildlife* that "[a]s the Michigan Constitution

Yet this argument that Michigan does not have a constitutional basis for its standing test—based on "caricatured textualism" that has been handily rejected—persists nonetheless.[23]  In particular, Justice WEAVER has championed this dubious theory,

> makes clear, the duty of the judiciary is to exercise the 'judicial power,' and, in so doing, to respect the separation of powers. While as a *general proposition,* the proper exercise of the 'judicial power' will obligate the judiciary to give faithful effect to the words of the Legislature—for it is the latter that exercises the 'legislative power,' not the judiciary—such effect cannot properly be given when to do so would contravene the constitution itself.  Just as the judicial branch owes deference to the legislative branch when the 'legislative power' is being exercised, so too does the legislative branch owe deference to the judicial branch when the exercise of the 'judicial power' is implicated.  Even with the acquiescence of the legislative and executive branches, the judicial branch cannot arrogate to itself governmental authority that is beyond the scope of the 'judicial power' under the constitution.  The 'textual' approach of [Justice WEAVER] is a caricatured textualism, in which the Legislature is empowered to act *beyond* its authority in conferring powers upon other branches that are also *beyond* their authority." [*Nat'l Wildlife,* 471 Mich at 637 (citations omitted; emphasis in original).] [*Nestlé Waters*, 479 Mich at 307-308.]

[23] The majority cites *Washington-Detroit Theatre Co,* 249 Mich 673, for the proposition that "this Court long ago explained that Michigan courts' judicial power to decide controversies was broader than the United States Supreme Court's interpretation of the Article III case-or-controversy limits on the federal judicial power because a state sovereign possesses inherent powers that the federal government does not."  This is precisely correct, but not in the way the majority applies it.  In fact, it actually *undermines* the majority's conclusion.  The majority here either fails to understand or willfully ignores the fact that the federal "case or controversy" requirement limits only the *range* of controversies that may be heard in federal courts, and that this is distinct from the requirement that an actual case or controversy *exists* in the first place.  In short, *that Michigan courts may decide types of controversies that the federal courts lack authority to decide does not mean that Michigan has no constitutional threshold for when a plaintiff may bring such a controversy.*  The *Lee/Lujan* standing test does not govern what *types* of cases/controversies may be brought, only whether a case/controversy *exists* in the first instance.

which—given Chief Justice KELLY's and Justice CAVANAGH's recent metamorphoses on the issue of standing, and Justice HATHAWAY's election to the Court—presents a convenient argument as the majority grasps at straws to explain why *Lee* and its progeny should be overruled. The fact remains that in neither the majority opinion in this case, nor any of the majority justices' concurring or dissenting opinions in prior cases, has a member of the majority ever articulated a sufficient response to these serious criticisms. This case has greater significance than prior cases, however, because the majority proceeds on these false understandings in order *to remove altogether the limits imposed by our Constitution*.

The proposition that Michigan courts are limited by an actual case or controversy requirement is beyond reproach. Michigan's case or controversy requirement is not drawn from the federal "case or controversy" language, but rather the parallel limitations imposed in Michigan's own constitution. This fact has been recognized by more than a century worth of *Michigan* caselaw, and thus it formed the basis for this Court's decision in *Lee* to incorporate a standing test that reflected this reality. The majority's author need only read his own opinions to realize as much. For example, in *People v Richmond*, this Court recently reaffirmed that "it is the 'principal duty of this Court . . . *to decide actual cases and controversies*.' That is, '"[t]he judicial power . . . is the right to determine *actual controversies* arising between adverse litigants, duly instituted in courts of proper jurisdiction."'" 486 Mich 29, 34; 782 NW2d 187 (2010) (majority opinion by CAVANAGH, J.) (citations omitted, emphasis added, ellipsis and brackets in original),

citing *Federated Publications,* 467 Mich at 112, and *Anway*, 211 Mich at 610, 616.[24]

These principles apply with as much force in ensuring that this Court does not hear moot

cases, or controversies that are not yet ripe.[25] More generally, one has to wonder whether

the majority may also wish to overrule all Michigan cases that rely on federal precedent

involving standing's sister doctrines of mootness and ripeness? If not, the majority is left

---

[24] In *Richmond*, three members of the current majority held that the prosecutor's case was moot, and therefore did not present an actual case and controversy, although the prosecutor had an interest in appealing the trial court's adverse evidentiary rulings before voluntarily dismissing the charges. Here, plaintiffs have no recognized interest separate from that of the general public, and no private right of action to vindicate. Thus, ironically, the majority is content to block *certain* parties from proceeding based on "case and controversy" grounds, while allowing *other* parties to proceed although they have *no* legal interests. I can discern no pattern or method other than that the majority wishes to use these cases as vehicles to overturn precedents with which it disagrees, or that it seeks to assist certain parties in achieving their political ends. Neither, of course, is legitimate.

[25] As this Court explained in *Michigan Chiropractic Council*:

> In seeking to make certain that the judiciary does not usurp the power of coordinate branches of government, and exercises only 'judicial power,' both this Court and the federal courts have developed justiciability doctrines to ensure that cases before the courts are appropriate for judicial action. These include the doctrines of standing, ripeness, and mootness.

> Federal courts have held that doctrines such as standing and mootness are constitutionally derived and jurisdictional in nature, because failure to satisfy their elements implicates the court's constitutional authority to exercise only 'judicial power' and adjudicate only actual cases or controversies. . . . Likewise, our case law has also viewed the doctrines of justiciability as affecting 'judicial power,' the absence of which renders the judiciary constitutionally powerless to adjudicate the claim. . . .

> \* \* \*

> Thus, we reiterate that questions of justiciability concern the judiciary's *constitutional jurisdiction* to adjudicate cases containing a genuine controversy. [475 Mich at 370-374 (emphasis in original).]

in the intellectually inconsistent position of defending those bodies of case law, which have the same constitutional foundation regarding justiciability as the standing principles articulated in *Lujan* and *Lee*. Indeed, these doctrines are based *exclusively* on the very case or controversy requirement, implicit in the Michigan Constitution, that the majority here rejects.

Like this Court in *Lee*, other courts have rejected the majority's imprecise and overly broad analysis regarding the constitutional basis for standing on similar grounds. For example, in *Bennett v Napolitano*, the Arizona Supreme Court recently stated:

> Article VI of the Arizona Constitution, the judicial article, does not contain the specific case or controversy requirement of the U.S. Constitution. But, unlike the federal constitution in which the separation of powers principle is implicit, our state constitution contains an express mandate, requiring that the legislative, executive, and judicial powers of government be divided among the three branches and exercised separately. This mandate underlies our own requirement that as a matter of sound jurisprudence a litigant seeking relief in the Arizona courts must first establish standing to sue. [206 Ariz 520, 525; 81 P3d 311 (2003).]

The majority's flawed constitutional analysis allows it to advance the false dichotomy that this state's standing jurisprudence must be based either on prudential concerns or on constitutional underpinnings, but not both. As the above analysis demonstrates, however, the constitutional separation of powers constraints explicitly provided in Michigan's Constitution give rise to minimal constitutional standing requirements, which this Court may augment when additional, prudential concerns arise.[26] Thus, the interpretation of

---

[26] Cf. *Travelers Ins Co v Detroit Edison Co,* 465 Mich 185, 196; 631 NW2d 733 (2001) ("Justiciability doctrines such as standing 'relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and

Michigan's constitution—in particular, its explicit limitations on judicial power and requirements of an actual case or controversy—provides a direct basis for applying the prudent and well defined federal test.

## B. *LEE* AND ITS PROGENY: CREATING CERTAINTY IN MICHIGAN JURISPRUDENCE

Although the concept of "standing" touches every civil action filed in this state, prior to the adoption of the *Lujan* standard in Michigan this Court had only produced a general description of the principles governing standing. The most recent description that garnered support from a majority of this Court is found in *House Speaker v State Admin Bd*,[27] which stated:

> Standing is a legal term used to denote the existence of a party's interest in the outcome of litigation that will ensure sincere and vigorous advocacy. However, evidence that a party will engage in full and vigorous advocacy, by itself, is insufficient to establish standing. Standing requires a demonstration that the plaintiff's substantial interest will be detrimentally affected in a manner different from the citizenry at large. [441 Mich at 554.]

Unsurprisingly, such a general proposition for a doctrine as important and far-reaching as standing proved difficult to apply. This fact became all too obvious in *Detroit Fire Fighters*, when this Court next examined Michigan's standing doctrine. *Detroit Fire Fighters* resulted in a split decision in which no majority could be found to explain what

---

explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" Quoting *Allen,* 468 US at 750, quoting *Vander Jagt v O'Neill,* 226 US App DC 14, 26-27; 699 F2d 1166 [1983] (Bork, J., concurring)).

[27] *House Speaker* was decided by this Court before the United States Supreme Court released its opinion in *Lujan*.

elements were essential to standing in Michigan.[28]  Indeed, although all four opinions

cited the same boilerplate language from *House Speaker* in support of their respective

positions, the justices did not agree on such fundamental questions as what standing is in

Michigan, what test should govern standing, and whether the plaintiffs had standing in

that particular case.[29]  This hodgepodge of disparate opinions compelled the Court to

reach the merits of the case without a clear consensus on the threshold question whether

the plaintiffs even had standing to bring the case.

This background formed the context in which this Court again confronted this

state's standing principles in *Lee* where, by a vote of six to one, this Court adopted and

incorporated *Lujan* into our standing jurisprudence.  As we stated then:

> In our view, the *Lujan* test has the virtues of articulating clear
> criteria and of establishing the burden of demonstrating these elements.
> Moreover, its three elements appear to us to be fundamental to standing; the
> United States Supreme Court described them as establishing the
> "irreducible constitutional minimum" of standing.  We agree.  [*Lee*, 464
> Mich at 740.]

Consistent with this Court's constitutional obligations, the nearly unanimous majority in

*Lee* correctly noted that the *Lujan* test provides a practical and workable framework for

---

[28] 449 Mich 629, opinions by WEAVER, J. (lead opinion); CAVANAGH, J., joined
by BOYLE, J. (concurring in part and dissenting part); RILEY, J., joined by BRICKLEY, C.J.
(concurring); and MALLETT, J., joined by LEVIN, J. (concurring in the result only).

[29] As this Court aptly summarized in *Lee*, among the various opinions in *Detroit
Fire Fighters*, "[s]ome focused on whether the plaintiff could establish an injury distinct
from that of the public, others on whether the plaintiffs were in the zone of interest the
statutory or constitutional provision at issue is designed to regulate.  Perhaps the clearest
template was set forward by Justice CAVANAGH, who, along with Justice BOYLE,
advocated adopting the United States Supreme Court's *Lujan* test."  *Lee*, 464 Mich at
739.

addressing what was previously an amorphous and often difficult concept. In its most basic form, the doctrine of standing can be properly reduced to the *Lujan* factors. What is standing if not the requirement that a plaintiff either has suffered or is in imminent danger of suffering an actual harm, that the harm is allegedly caused by the defendant, and that the result of the court's action can redress the wrong or injury? While the federal and state constitutions are not coterminous, they have developed on a parallel track, and the interpretation of federal constitutional law may inform state constitutional law when they share common elements. Although the majority has littered its opinion with instinctive repetitions that this state's standing jurisprudence is "prudential," the majority cannot explain what is *im*prudent about the "irreducible" and traditional description of the standing doctrine articulated in *Lujan*.

By introducing an objective framework based on three well-developed and readily understandable criteria—injury in fact, causation, and redressability—the *Lee* decision simplified and made more practical the doctrine of standing in this state. As is evidenced by how justices on *this Court* could not previously agree about what, exactly, standing meant in Michigan under *House Speaker,* 443 Mich 560, the *Lee* framework provides certainty. The progeny of *Lee* bear this out: in a decade's worth of cases, Michigan trial and appellate courts have consistently and appropriately applied Michigan's standing doctrine.[30] Indeed, during this time the doctrine itself has not changed. Only the

---

[30] See *Lee*, 464 Mich at 739-740 (incorporating the federal standing analysis articulated in *Lujan* into Michigan standing jurisprudence); *Nat'l Wildlife*, 471 Mich at 628-629 (organizational standing and legislative authority to grant citizen standing);

personal views of justices on this Court—and only those who now overrule a decade's worth of cases—have changed.

As a matter of simple prudence and proper exercise of this Court's constitutional authority, this Court is empowered to create clear rules that are easily accessible and applicable in the future. Aside from ensuring that Michigan courts only hear genuine cases and controversies in accord with its constitutionally mandated judicial powers, adopting the well-defined *Lujan* test provides the additional benefit of ensuring that Michigan's standing doctrine is guided by clearly articulated and well-developed rules. A well-understood and practical standing test serves to uphold the separation of powers and promote the sound administration of justice. Indeed, only such a framework can ensure that courts will be governed by the rule of law, which itself ensures equality of treatment under the law. Inexplicably, the majority apparently celebrates that, prior to *Lee*, Michigan's standing doctrine suffered from inconsistent application, and in some cases, was not analyzed or applied at all.[31] Unfortunately, the majority's test can promise no better in the future; this is particularly true since, by its explicit terms, standing can now be determined at the "discretion" of trial courts.

---

*Nestlé Waters*, 479 Mich at 295-296, 302-303 (legislative authority to grant citizen standing); *Rohde*, 479 Mich at 354-355, (taxpayer and qui tam standing); *Michigan Chiropractic*, 475 Mich 363; *Associated Builders & Contractors,* 472 Mich 117 (standing necessary in order to seek a declaratory judgment pursuant to MCR 2.605).

[31] *Ante*, ___ n 3.

Notably, *Lee* did not supplant or "sacrifice" this Court's standing jurisprudence, as the majority in this case erroneously states. Rather, it adopted the *Lujan* test as a means of "*supplementing* the holding in *House Speaker*, as well as this Court's earlier standing jurisprudence, e.g., *Daniels* and *Risser*." *Lee*, 464 Mich at 740 (emphasis added). The majority today is not so kind. Characteristic of its reckless treatment of this Court's precedent and its willingness to rewrite entire areas of the law rather than letting them develop over time, the majority today jettisons a decade of this state's caselaw, which itself was based on nearly a century of rules and principles developed by the United States Supreme Court. And it does so in favor of what? A general, one paragraph articulation of "prudential" standing that proved so utterly unworkable a mere fifteen years ago under *House Speaker,* 443 Mich 560. Michigan citizens deserve better from their highest court.

Reliance on the accessible and well-understood federal test was a proper and prudent course of action for this Court to take in *Lee*. Indeed, this Court has often affirmed the principle that it is not questioned that the "powers of Michigan's judiciary . . . are modeled after the federal judiciary . . . ." *Charles Reinhart Co v Winiemko*, 444 Mich 579, 592 n 24; 513 NW2d 773 (1994) (opinion by Riley, J.); see also *Nat'l Wildlife*, 471 Mich at 627-628. This is particularly true in the context of standing where "Michigan courts previously have relied upon federal authority when deciding standing questions." *House Speaker*, 441 Mich at 560 n 21. And Michigan is not alone. Because states' judicial powers are plenary whereas federal judicial power is limited, *no* state in this country has an explicit "case or controversy" requirement in its

51

constitution analogous to that of the federal constitution. Nonetheless, nearly half the states have adopted the *Lujan* test or its equivalent as their own in accordance with their state constitutional requirements regarding standing.[32] Like this Court in *Lee*, these states

[32] E.g. the following states do *not* have an explicit "case or controversy" requirement in their constitutions, yet have adopted or relied on the federal standing test as articulated in *Lujan*. Alabama—*Stiff v Alabama Alcoholic Beverage Control Bd*, 878 So 2d 1138, 1142 (Ala, 2003) (applying the *Lujan* test for standing); Alaska—*Chenega Corp v Exxon Corp*, 991 P2d 769, 785 (Alas, 1999) (recognizing *Lujan*); Arizona—*Bennett,* 206 Ariz at 525 (noting that, although "[a]rticle VI of the Arizona Constitution, the judicial article, does not contain the specific case or controversy requirement of the U.S. Constitution," "federal case law [is] instructive" due to separation of powers principles and as a "matter of sound jurisprudence"); Connecticut—*Gay & Lesbian Law Students Ass'n v Bd of Trustees*, 236 Conn 453, 466 n 10; 673 A2d 484 (1996) (stating that "[t]here is little material difference between what we have required and what the United States Supreme Court in *Lujan* demanded of the plaintiff to establish standing"); Delaware—*Dover Historical Society v City of Dover Planning Comm*, 838 A2d 1103, 1111 (Del, 2003) (noting that "[t]his Court has recognized that the *Lujan* requirements for establishing standing under Article III to bring an action in federal court are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware"); Georgia—*Granite State Outdoor Advertising, Inc v City of Roswell*, 283 Ga 417, 418; 658 SE2d 587 (2008) (recognizing *Lujan* as the appropriate test for standing and noting that "[i]n addition to the constitutional requirements for standing, there is a subset of 'prudential' standing requirements that have been developed by the United States Supreme Court"); Hawaii—*Akinaka v Disciplinary Bd of Hawai'i Supreme Court*, 91 Hawaii 51, 55; 979 P2d 1077 (1999) (utilizing a test comparable to the *Lujan* test derived from federal caselaw); Idaho—*Young v City of Ketchum*, 137 Idaho 102, 104; 44 P3d 1157 (2002); Iowa—*Godfrey v State,* 752 NW2d 413, 418 (Iowa, 2008) (noting that "our doctrine on standing parallels the federal doctrine," and applying *Lujan* in the context of a public interest claim); Mississippi—*Clark Sand Co v Kelly*,___So 3d __ Miss __; 2010 Miss LEXIS 94 (2010) (utilizing the *Lujan* test); New Mexico—*Forest Guardians v Powell*, 130 NM 368, 375; 24 P3d 803 (NM App, 2001), quoting *United Food & Commercial Workers Union Local 751 v Brown Group, Inc*, 517 US 544, 551; 116 S Ct 1529; 134 L Ed 2d 758 (1996) (quoting federal law and applying the same standing criteria used in *Lujan*), and *John Does I through III v Roman Catholic Church of the Archdiocese of Santa Fe, Inc*, 122 NM 307, 311-314; 924 P2d 273 (NM App,1996) (noting that "[i]t is not enough to establish standing that an identifiable interest has been injured," citing the federal definition of "injury in fact," and concluding that although the "New Mexico Constitution does not speak of Cases or Controversies," "we are aware of

realize the wisdom behind the federal standing test and how it provides a practical and workable standing framework that operates within the bounds of their similar constitutional separation of powers requirements by giving *meaning* to those requirements. Moreover, *no* state's highest court has adopted the federal standing test as its own only to decide, a few short years later, to abandon the doctrine and return to a prior amorphous test that parties and the courts found difficult to apply. Although Justice

no basis for concluding that those requirements are stricter than those imposed by the federal Constitution") (citation omitted); North Carolina—*Neuse River Foundation, Inc v Smithfield Foods, Inc,* 155 NC App 110, 114; 574 SE2d 48 (2002) (quoting the *Lujan* test); Ohio—*Bourke v Carnahan*, 163 Ohio App 3d 818, 824; 840 NE2d 1101 (2005) (citing *Lujan* for the three prong test); Oklahoma—*Cities Serv Co v Gulf Oil Corp*, 1999 Okla 16, ¶ 3; 976 P2d 545 (Okla, 1999) (citing the *Lujan* test); South Carolina—*Sea Pines Ass'n for Protection of Wildlife*, *Inc v South Carolina Dept of Natural Resources*, 345 SC 594, 601; 550 SE2d 287 (2001) (stating that "*Lujan* set forth the 'irreducible constitutional minimum of standing,'" and adopting the *Lujan* standard); South Dakota—*Benson v State*, 2006 SD 8, ¶ 22; 710 NW2d 131 (SD, 2006) (recognizing *Lujan* as the test for standing); Tennessee—*ACLU of Tennessee v Darnell*, 195 SW3d 612, 620 (Tenn, 2006) (citing *Lujan* and applying the federal test for standing); Vermont—*Parker v Town of Milton*, 169 Vt 74, 77-78; 726 A2d 477 (1998) (noting that Vermont has adopted the test for standing articulated in *Lujan*); West Virginia—*Findley v State Farm Mut Auto Ins Co*, 213 W Va 80, 94; 576 SE2d 807 (2002) (citing *Lujan*); Wyoming—*White v Woods*, 2009 Wy 29A, ¶ 20; 208 P3d 597 (Wy, 2009) (stating that *Lujan* established "the irreducible constitutional minimum of standing" and adopting it as the state's test). Additionally, the following states, whose constitutions also lack an explicit "cases or controversy" requirement, employ a test that is substantially similar to the federal test. E.g., Illinois—*Greer v Illinois Housing Dev't Auth*, 122 Ill 2d 462, 492-493; 524 NE2d 561 (1988) (citing federal caselaw and determining that, in order to have standing, "the claimed injury, whether actual or threatened, must be: (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief") (citations omitted); Kansas—*Sumner Co Bd of Co Comm'rs v Bremby*, 286 Kan 745, 761; 189 P3d 494 (2008) (requiring that "a person must demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct"); Virginia—Va Code Ann 62.1-44.29 (statutorily adopting the same three prong test in the context of water-related claims).

WEAVER repeatedly calls the test established by *Lee* "unprecedented," clearly it is the majority's decision today—not *Lee*—that defies precedent.

Ultimately, the majority's decision today redounds only to the benefit of those who wish to use the courts—the least politically accountable branch of government—to legislate and regulate increasingly larger spheres of Michigan life and politics.[33] In this regard, we are quite sure the majority opinion suffers from a typographical error when it states that "[w]e hold that Michigan standing jurisprudence should be restored to a limited, prudential doctrine," because what the majority gives us today is anything but a "limited" doctrine. Indeed, with this case, the majority overrules those principles and rules that ensured that the doctrine would have articulated and meaningful limits in Michigan. Writing for the Court in *Nat'l Wildlife*, Justice MARKMAN foreshadowed the unfortunate turn of events altering Michigan's standing jurisprudence that today has come to pass:

> By their diminishment of a traditional check and balance upon the exercise of the 'judicial power,' the concurring/dissenting Justices [CAVANAGH, KELLY, and WEAVER] would, if their position were ever to gain a majority, inflict considerable injury upon our system of separation of powers and the rule of law that it has produced. [*Nat'l Wildlife,* 471 Mich at 628.]

Justice HATHAWAY has now provided those justices with their fourth vote, and with it surely will come the inevitable breakdown of the rule of law in the domain of standing that only *Lee* and its progeny had stood athwart.

---

[33] See, generally, *Nat'l Wildlife*, 471 Mich at 617-623.

## III. THE MAJORITY'S SELF-SERVING AND INCONSISTENT
## APPROACH TO THE DOCTRINE OF STARE DECISIS

Finally, the far-reaching, deleterious impact of the majority's decision in this case is equally inherent in its methods for overruling significant, precedential opinions of this Court. The majority's claim that it has good reason to overrule *Lee* and its progeny, in contravention of the doctrine of stare decisis, is bankrupt and self-serving. Most significantly, in jettisoning *Lee*, the four justices constituting the majority fail to apply *any* agreed-upon test to examine whether this change in law is justified. The only clear commonality is their shared conclusion that *Lee* was clearly wrongly decided. This conclusion is mystifying because it is directly counter to the past positions of three members of the current majority, *who supported* Lee—*and the case or controversy requirement underpinning* Lee—*in previous cases*. Finally, the majority's determination that overruling *Lee* will benefit the public depends entirely on circular, self-serving reasoning; the majority simply concludes that its preferred regime would better serve the public without any attention to the actual desires of the Michigan public—as expressed, for example, in the Michigan Constitution—or to the commonplace conclusion of courts throughout the nation that the test articulated in *Lujan* well serves the nation's courts and citizens.

### A. THE MAJORITY'S STANDARDLESS APPROACH
### TO OVERRULING PRECEDENT

In *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000), this Court articulated several factors for consideration before a court should overrule established precedent. "The first question, of course, should be whether the earlier decision was

wrongly decided." *Id.* at 464. But "the mere fact that an earlier case was wrongly decided does not mean overruling it is invariably appropriate." *Id.* at 465. Rather, "[c]ourts should also review whether the decision at issue defies 'practical workability,' whether reliance interests would work an undue hardship, and whether changes in the law or facts no longer justify the questioned decision." *Id.* at 464.

The majority's conclusion that *Lee* was wrongly decided is untenable. The test *Lee* enunciated is loyal to the Michigan Constitution, is consistent with our jurisprudence, and has been adopted and successfully applied throughout the nation by states with constitutions similar to our own. Next, there is no indication that the *Lee* test "defies 'practical workability,'" that "reliance interests would work an undue hardship," or that "changes in the law or facts no longer justify" it. *Robinson,* 462 Mich at 464. To the contrary, in standardizing factors for standing throughout the state based on the well-established and accepted federal test, *Lee* created a predictable analytic tool. It thus enhanced workability for courts and parties and protected parties' interests from potentially unanticipated discretionary decisions of individual courts, which did not have the benefit of concrete, guiding principles before *Lee*.

In jettisoning this Court's constitutional standing jurisprudence, however, Justice CAVANAGH chooses not to rely on the *Robinson* factors. Instead, he cites Chief Justice KELLY's analysis in *Petersen v Magna Corp*, 484 Mich 300; 773 NW2d 564 (2009).

There*,* the Chief Justice expressed her disapproval of *Robinson*.[34]  *Petersen*, 484 Mich at 316-317.  She thus articulated her own preferred standard, albeit while "neglect[ing] even to apply her new stare decisis standard to determine whether *Robinson* itself should be overruled."  *Id.* at 388 n 42 (MARKMAN, J., dissenting).  *Only* Justice CAVANAGH concurred in the Chief Justice's stare decisis analysis in *Petersen,* and only the Chief Justice expressly joins Justice CAVANAGH's reliance on *Petersen* here.

In declining to join Justice CAVANAGH's discussion of stare decisis, Justices WEAVER and HATHAWAY go one step further.  In their concurrences, they expressly advocate *no* standardized approach to overruling precedent.  Concluding that "[t]here is no need for this Court to adopt any standardized test regarding stare decisis," Justice WEAVER advocates for a "case-by-case" analysis based on undefined notions of "judicial restraint, common sense, and fairness."  Her application of these notions to this case exemplifies the unprincipled nature of her position.  She simply advances the empty, circular conclusion:  "In serving the rule of law and applying judicial restraint, common sense, and a sense of fairness to the case at hand, I agree with and join the majority opinion's holding that *Lee* and its progeny are overruled."  Justice HATHAWAY describes a judge's duty when deciding whether to overrule precedent as a "policy determination" that "will be dependent upon the facts and circumstances presented."  Like Justice

---

[34] Notably, Chief Justice KELLY concluded that "*Robinson* is insufficiently respectful of precedent" and indicated that she "would modify it by shifting the balance back in favor of precedent."  *Petersen*, 484 Mich at 316-317.  This allegiance to precedent is remarkably absent in this case despite the majority's reliance on Chief Justice KELLY's *Petersen* formulation.

57

WEAVER, she votes to overrule *Lee* based on an empty, unexplained conclusion: "the reasons for overruling *Lee* are paramount to any articulated test and the special and compelling justifications to do so are overwhelming in this case."

Justices WEAVER and HATHAWAY have each espoused their troubling views that reviewing whether a case should be overruled is merely a "policy" determination that need not be guided by any standard in several other recent cases, including *Univ of Michigan Regents v Titan Ins Co*, ___ Mich ___; ___ NW2d ___ (2010), and *McCormick,* ___ Mich ___. Their professed approaches rely entirely on their personal, subjective views of the law. As Justice YOUNG noted in his dissent to *Univ of Mich Regents*, their approaches are "the very antithesis of the 'rule of law.'" ___ Mich at ___ (YOUNG, J., dissenting). He observed:

> The rule of law, by definition, requires judges to decide cases on the basis of principles, announced in advance, rather than on a personal or subjective preference for or against a party before them. This ensures stability in the law despite the diversity of judges' personal beliefs. Whether we, as judges, "like" the outcome is, quite simply, *irrelevant* to whether it reflects a correct conclusion of law. It is harrowing that Justices WEAVER and HATHAWAY either do not understand this concept or refuse to subscribe to it, preferring to base their decisions on subjective "policy consideration[s]." [*Id.* at ___.]

Justice MARKMAN also warned that the primary problem with this approach is that

> "litigants will, of course, have no notice beforehand of which ['analytical approach'] will be employed, for the justices themselves will not know this beforehand." Under the concurring justices' "analytical approaches,"

> "there [would be] no consistently applied . . . process with which the judge promises beforehand to comply. He or she may promise to be "fair," and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each [precedent] on a case-by-case basis, using whatever ['policy

considerations'] he or she believes are required in that instance.  And the suspicion simply cannot be avoided that these varying and indeterminate ['policy considerations'] may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes."  [*Id.* (MARKMAN, J., dissenting), quoting *Petersen*, 484 Mich at 381-382 (MARKMAN, J., dissenting).]

These warnings have come full circle in this case where the majority overrules an entire body of law without relying on any agreed-upon factors to decide whether overruling precedent is appropriate.

## B.  AFTER SUPPORTING *LEE* IN THE PAST, THE MAJORITY NOW INEXPLICABLY CONCLUDES THAT IT WAS WRONGLY DECIDED

Significantly, the majority's decision to overrule *Lee* under the various "standards" espoused individually by each justice depends, of course, on its threshold conclusion that *Lee* was wrongly decided.  But this conclusion itself is belied by the reliance of Chief Justice KELLY, Justice WEAVER and Justice CAVANAGH on the wisdom of *Lee*.  Chief Justice KELLY and Justice CAVANAGH *expressly joined* the Court's adoption of the *Lujan* test in *Lee*.  *Lee*, 464 Mich at 750 (KELLY, J., joined by CAVANAGH, J., dissenting but "agree[ing] with the majority's adoption of the *Lujan* test").[35]  Indeed, Justice CAVANAGH was the *first* justice of this Court to propose adopting the *Lujan* test; he expressly employed and advocated for adoption of the *Lujan* test in concluding that the plaintiffs had standing in the fractured *Detroit Fire Fighters* decision.  See 449 Mich at 651-652 (CAVANAGH, J., dissenting in part).  Justice WEAVER

---

[35] See also *Crawford*, 466 Mich 256-257 (per curiam opinion relying on *Lee* in which CAVANAGH, J., concurred).

herself accepted *Lee* in *Associated Builders*, 472 Mich at 127 & n 16, where she explicitly held that *Lee* governs standing in declaratory actions and in cases where a plaintiff seeks to enforce an alleged statutory right but the statute does not confer standing by its own terms. These justices have also explicitly affirmed their agreement with the concept that the judicial power in Michigan is bounded by a case or controversy requirement. E.g. *Richmond*, ___ Mich at ___ (CAVANAGH, J., joined by KELLY, CJ., MARKMAN and HATHAWAY, JJ.); ("'[t]he judicial power . . . is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction'"') (citations omitted; ellipsis and brackets in original); *In re Certified Question from the United States Dist Court for Eastern Dist of Michigan,* 622 NW2d 518, 519 (2001) (WEAVER, J., dissenting) ("'[J]udicial power'" is "'the power to hear and determine controversies between adverse parties, and questions in litigation.'") (citation and quotation marks omitted).

In light of these justices' former positions, I am mystified at their current conclusions that *Lee* was not only wrongly decided, but was *so* misguided that we should now throw Michigan's standing jurisprudence into turmoil in order to overrule *Lee*. Indeed, their result has every appearance of a mere power grab intended to ascribe broad, unconstitutional authority to the Court as it is *now* configured with this new majority at the helm. Ironically, Justice WEAVER's dissenting comments in *In re Certified Question from Fourteenth Dist Court of Appeals of Texas,* 479 Mich 498; 740 NW2d 206 (2007), are apropos. There, she reiterated her lack of support for MCR 7.305(B), which permits this Court to entertain requests for advisory opinions from foreign courts, because the

60

subrule "lacks any limiting language on when the Court may answer a certified question . . . ." *Id.* at 550 (WEAVER, J., dissenting). A lack of express limits, she opined, "leav[es] the door and the docket open to the whims of the majority." *Id.*

As if to illustrate her point, the majority underpins its supposed consideration of the doctrine of stare decisis with its conclusion that our constitutional standing doctrine is "at the expense of the public interest . . . because it may prevent litigants from enforcing public rights, despite the presence of adverse interests and parties, and regardless of whether the Legislature intended a private right of enforcement to be part of the statute's enforcement scheme." But this self-serving, rhetorical formulation of the "public interest" is entirely of the majority's own making.[36] It ignores that, in this case, there is *no* indication that the Legislature intended that plaintiffs have a private right to enforce the statute at issue. Most significantly, it ignores the public's interest *as expressed in our constitution,* and explained in depth above, in courts that do not have unlimited power and, absent exceptions expressly provided by the constitution, should not exceed the traditional judicial power by intruding on the powers of the executive and legislative branches.

---

[36] The majority argues that, in federal courts and the dozens of states who use the *Lujan* framework, those entities' respective constitutions *cause serious detriment to the public interest*. This alarmist reasoning provides no support for overruling *Lee*. Indeed, this whole argument underscores the manipulative nature of the majority's stare decisis test, which here is used to displace a widely accepted and commonly used national standard. More disruptive to the public interest is the state of law to which the majority returns Michigan today: no defined standards, thus allowing litigious individuals to bring unfounded lawsuits against fellow citizens.

61

## C. MICHIGAN JURISPRUDENCE IN TURMOIL:
## THE MAJORITY'S INCREASING WILLINGNESS TO OVERRULE PRECEDENT
## WITH WHICH IT DISAGREES

Thus the majority continues to exhibit its absolute disregard for precedent inconvenient to its aims without regard to the consequences. As Justice MARKMAN emphasized in his dissent to the majority opinion in *McCormick*, ___ Mich at ___:

> Even a cursory analysis of the majority's treatment of precedent since it ascended to power in January 2009 reveals a lack of sufficient regard for recent precedents that is directly contrary to their own previous assertions of the need not to needlessly overrule cases on account of stare decisis. Past complaints on their part that cases should not be overruled when the only thing that has changed is the membership of the Court have gone by the wayside.

"[A]ll the justices who comprise the majority . . . should more clearly recognize the consequences of what they are doing." *Id.* at ___ (emphasis omitted). Indeed, in overruling numerous significant cases of this Court—the growing list of which is catalogued in *McCormick* by Justice MARKMAN, *id.* at ___—in the brief period since the current majority came to power in January 2009, I find the majority's feigned adherence to the doctrine of stare decisis here hard to swallow. Nothing about the majority's decision today "'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decision, [or] contributes to the actual and perceived integrity of the judicial process.'" See *ante* at ___, quoting *Payne v Tennessee,* 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991). Rather, the majority throws into turmoil a well-accepted and constitutionally sound standing doctrine *applicable to every civil suit filed in this state* that this Court adopted to rectify the total uncertainty in this area that was evident in cases such as *Detroit Fire Fighters,* 449 Mich 629.

Accordingly, I am nonplussed by Justice CAVANAGH's ironic lip service to Alexander Hamilton's warning that, "to "'avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them . . . .""" *Ante* at ___, quoting *Petersen*, 484 Mich at 314-315 (opinion by KELLY, J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961).

Finally, as Justice MARKMAN has also illustrated, this case presents yet another troubling element of the majority's current unbounded disregard for precedent. Here as in several other recent cases, see *McCormick*, ___ Mich at ___, instead of accepting the issues as framed and argued by the parties throughout the case, the majority instead directed the parties to brief whether a decision by the former majority should be overruled. Yet, as noted, the parties to this case have *always* argued that *Lee* governs their dispute. Even plaintiffs—for whom the majority renders a favorable decision here—never challenged the correctness and applicability of *Lee* to their case. Further, although other groups and members of the public have participated in this case by filing briefs *amicus curiae* at the majority's invitation, not a *single* brief supports plaintiffs' argument that they have standing *here*.[37]

---

[37] Indeed, of the *amici* who responded to the majority's request to file briefs analyzing the correctness of *Lee,* only one questioned *Lee* and the cases following it: the National Wildlife Federation (NWF), which was the successful plaintiff in *Nat'l Wildlife,* 471 Mich 608, which applied *Lee*. Most notably, even the NWF does *not* argue that plaintiffs have standing here. Rather, the NWF stresses its belief that *if* the Legislature

## IV.  FURTHER RESPONSE TO THE MAJORITY

Rather than ash, the majority's stare decisis analysis should taste like bile in their mouths: like a bulimic after a three day bender, the majority justices now *purge* a decade's worth of vigorous protestations that they are committed to the principle of stare decisis.  As Justice YOUNG demonstrates at length in *Univ of Mich Regents*, ___ Mich at ___ (YOUNG, J., dissenting), members of the majority stridently defended stare decisis for many years when past cases supported their dissenting positions.  Then-Justice KELLY summed up their position in *Pohutski v City of Allen Park,* 465 Mich 675, 712; 641 NW2d 219 (2002) (KELLY, J., *dissenting*), stating:  "[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable."  Yet here they overrule *Lee,* most notably without *ever* addressing their former adherence to the *Lee/Lujan* test.

As the Court established in *Lee* and as I recount here, *Lee* was built on this Court's historical concepts of standing.  By reversing the line of post-*Lee* cases here, the majority claims that it "brings this Court back to the status quo ante."  Unfortunately, the pre-*Lee* status quo resulting from *House Speaker*, 443 Mich 560, was confusion and bitter division regarding rules that provided no clear guidance regarding Michigan's

---

*expressly* grants a plaintiff standing in a statute, the courts should permit the suit without regard to whether the plaintiff also qualifies for standing under the *Lee/Lujan* test.

constitutional standing requirements.[38]  It is this state to which the majority returns

Michigan law.  *Lee* did not sacrifice Michigan standing jurisprudence, as the majority

persists in repeating, nor did *Lee* conclude that federal standing jurisprudence was

expressly binding in Michigan.  Rather, *Lee* favored the commonly-accepted federal test

which brought consistency to Michigan courts in light of our lack of a clearly articulated,

workable test.  Further, as members of the majority have recognized, there simply is no

constitutional "conflict" that would prevent Michigan's continued use of the *Lujan/Lee*

test for standing.[39]  These truths—as well as the overall reasonableness of the *Lee* test—

are evident in the near-unanimous acceptance of the test in *Lee* itself.  How is it possible

that the majority now rejects the very test suggested by Justice CAVANAGH himself in

*Detroit Fire Fighters,* accusing the *Lee* Court of adopting a test that "casually displaced

decades of inconsistent precedent," "is likely to result in serious detriment to the public

interest," and is "contrary" to Michigan law?  As Justice YOUNG has observed in a

---

[38] The majority persists in suggesting that Michigan had a clear, workable standing doctrine for "decades" before *Lee* was decided.  To the contrary, our 1993 decision in *House Speaker,* where the Court was apparently unable to make sense of Michigan's historical approach to standing, left our standing doctrine muddled and impossible to apply with any consistency.

[39] The majority's unexplained suggestion that, in Michigan, "controversy" means something different than throughout the rest of the nation is without basis.  As I explain above, the federal "case or controversy" requirement limits only the *range* of controversies that may be heard in federal courts, and this is distinct from the requirement—common to federal and state law alike—that an actual case or controversy *exists* in the first place.

similar context,[40] United States Supreme Court Justice Antonin Scalia may have best described our concerns about the majority's recent about-face with regard to stare decisis as well as its new approach to standing with the following observation:

> Evidently, the governing standard is to be what might be called the unfettered wisdom of a majority of this Court, revealed to an obedient people on a case-by-case basis. This is not only not the government of laws that the Constitution established; it is not a government of laws at all. [*Morrison v Olson,* 487 US 654, 712; 108 S Ct 2597; 101 L Ed 2d 569 (1988) (Scalia, J., dissenting).]

Finally, although the majority criticizes me for actually addressing the questions presented in this case, my analysis is necessary *precisely because* the majority applies an unworkable, amorphous approach to standing. The lower courts had little trouble agreeing, in relatively brief decisions, that plaintiffs do not have standing under the principles enunciated in *Lee.* But the majority's approach so obscures the reasons courts impose standing requirements *in the first place* that it leaves the dissent in a position akin to one who must "prove a negative"; thus, I attempt to show why the lower courts' conclusions that plaintiffs clearly could not proceed are indisputably correct under the terms of the statute invoked by plaintiffs to establish standing. Indeed, in light of the express terms of the school code, its enforcement procedures, and its disciplinary provisions, I am baffled by the majority's conclusion, under its own new discretionary approach, that the trial court abused its discretion by concluding that plaintiffs could not proceed here. How is the majority's new non-test for standing anything but a

---

[40] *Univ of Mich Regents,* ___ Mich at ___ (YOUNG, J., dissenting).

66

proclamation that *it* will decide, on the basis of personal policy considerations, whether a plaintiff may maintain a suit against a particular defendant?

The majority essentially concludes that plaintiffs have standing because their safety might have been one aim of MCL 380.1311a(1) without any regard to the Legislature's actual intent or to the ramifications of this suit. For example, although *no one* in this suit represents students' rights—and thus no one may consider their rights as the suit proceeds or in an eventual settlement—the majority presumes that the right result will simply come out in the wash after the complaint is authorized on standing grounds. Indeed, under the majority's approach, what prevents *anyone* with a proclaimed "substantial interest" from suing a defendant such as the school board here in an attempt to trample on the rights of an unrepresented third party?[41] Because a plaintiff no longer

---

[41] May I sue a landlord under a local noise ordinance for failing to evict my noisy neighbor without notice to my neighbor? May I sue the police department for failing to ticket the teenagers loitering outside my favorite window seat at a local restaurant? In each case, I might allege that the defendant had a duty to enforce a particular law and that I had a "substantial interest" in its enforcement under the facts presented. Further, in each case, the named defendant may be perfectly willing to comply with my demands and happy to do so without arguing, as defendants do here, that the case should not proceed because I have no right to govern his relationship with the third party or affect the absent third party's rights. This Court expressed similar concerns regarding the view of the judicial power offered by the dissent in *Nat'l Wildlife Fed*—which the majority today overrules—when discussing environmental suits brought under MCL 324.1701(1) of the Michigan environmental protection act:

> Under th[e former dissenting] view of the "judicial power," "any person," for example, could seek to enjoin "any person" from mowing his lawn with a gas-powered mower because such activity allegedly creates air pollution and uses fossil fuels when other alternatives are available. "Any person" could sue "any person" for using too much fertilizer on his property, or allowing too much runoff from a feedlot on his property.

67

needs to show a concrete and particularized injury, or that the court actually has the power to grant relief *to me* from *that defendant*, or that the legislative body *intended to create a cause of action,* presumably any such plaintiff can proceed. Particularly by permitting plaintiffs to sue to enforce a governmental agency's *statutory* duties with no attention to whether the Legislature *intended* to create a cause of action, the majority utterly ignores separation of powers principles including the Legislature's sole purview to legislate such duties and to define the proper mechanisms for their enforcement.[42]

Consistent with the majority's deconstruction of Michigan's guiding legal principles over the last two years, the result boils down to this: in this state, anyone has

> "Any person" could sue "any person" from using excessive amounts of pesticides in his home or garden or farm. "Any person" could sue "any person" for improperly disposing of used petroleum-based oils. "Any person" could sue "any person" for improper backyard grilling practices, excessive use of aerosol sprays and propellants, or wasteful lawn watering. [471 Mich at 649-650.]

At least the scenarios presented in *Nat'l Wildlife* involved suits against the allegedly offending party; here, the majority permits plaintiffs to maintain suit despite the absence of the students they seek to punish.

[42] Members of the executive branch are thus vulnerable to suits filed by any person claiming a substantial interest in their affairs. I note the following timely illustration of what may arise. In the midst of the City of Detroit's ongoing financial woes and the ongoing crisis its public school system, an activist group joined teachers and school board members to sue Robert Bobb, the emergency financial manager of the Detroit Public Schools, seeking to challenge the salary terms of his contract with the governor and the state superintendent of schools. A circuit court judge dismissed the suit, concluding that the plaintiffs did not have legal standing. Marisa Schultz, *Judge throws out lawsuit over Financial Manager Bobb's pay*, The Detroit News, July 29, 2010, available at <http://www.detnews.com/article/20100729/SCHOOLS/7290468/1409/Judge-throws-out-lawsuit-over-DPS-Financial-Manager-Bobb-s-pay> (accessed July 30, 2010). Under the majority's new approach, their suit seems tenable because all they have to allege is an ill-defined "substantial interest" in the management of local schools.

standing to sue anyone else, any time. As in *McCormick*, ___ Mich ___, for example, where the majority significantly lowered the threshold for suits against Michigan drivers under our automobile no-fault insurance scheme,[43] the majority continues to encourage litigation at a high cost to individuals, the courts, local governments and local officials. This complete destabilization of established law benefits no one.

## V. CONCLUSION

For each of these reasons, I dissent. I would affirm the decision of the Court of Appeals, which reached the correct result and properly applied the law of this state. The majority's conclusion that plaintiffs have standing here is devoid of any analysis and incorrect under any meaningful test. Its decision to grant standing here under an amorphous new test of its own making is unprincipled and opportunistic; in its haste to overrule yet another precedent of this Court, it grants teachers the right to sue for expulsion of children from our public schools without any regard for the students' rights. Finally, its choice to eschew the well-established *Lee* test aggregates limitless power in the courts, is contrary to our constitution, and will only damage the rule of law in our state.

YOUNG and MARKMAN, JJ., concurred with CORRIGAN, J.

---

[43] See *McCormick*, ___ Mich at ___ (MARKMAN, J., dissenting) ("By nullifying the legislative compromise that was struck when the no-fault act was adopted—a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance—the Court's decision today will restore a legal environment in which each of these hazards reappear and threaten the continued fiscal soundness of our no-fault system.").